## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HMH HOSPITALS CORPORATION, dba HACKENSACK UNIVERSITY MEDICAL CENTER, 30 Prospect Avenue Hackensack, NJ 07601-1915, | |
| HMH HOSPITALS CORPORATION, dba JERSEY SHORE UNIVERSITY MEDICAL CENTER, 1945 State Route 33 Neptune, NJ 07753-4859, | Civil Action No. 24-cv-1901 |
| HMH HOSPITALS CORPORATION, dba RARITAN BAY MEDICAL CENTER, 530 New Brunswick Avenue Perth Amboy, NJ 08861-3654 | |
|                 Plaintiffs, | |
| v. | |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services 200 Independence Avenue SW Washington, DC 20201, | |
|                 Defendant. | |

## COMPLAINT

Plaintiffs Hackensack University Medical Center, Jersey Shore University Medical Center, and Raritan Bay Medical Center (the Hospitals), by and through their undersigned counsel, submit this Complaint for relief against defendant Xavier Becerra, in his official capacity as Secretary of the Department of Health and Human Services, and allege as follows:

## PRELIMINARY STATEMENT

1.      This case challenges the Secretary's irrational and unlawful interpretation of the statutes he is entrusted to administer—which has deprived the Hospitals of the reimbursements they are due—along with his refusal to enable the Hospitals to effectively employ the congressionally mandated procedures for obtaining relief from these underpayments. With *Chevron* deference overruled (*see Loper Bright Enters. v. Raimondo*, No. 22-451, slip op. (U.S. June 28, 2024); *Relentless, Inc. v. Dep't of Commerce*, No. 22-1219, slip op. (U.S. June 28, 2024)), courts may no longer routinely uphold the decisions of agencies in technical fields simply because of the complexity of the statutory schemes they oversee. Rather, "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Id*. at 22. And it is the job of the Court to discern the "best" reading. *Id*. at 23 ("In the business of statutory interpretation, if it is not the best, it is not permissible."). In this new paradigm, more than ever, the Secretary's actions at issue here must fall, and the Hospitals are entitled to the relief they seek.

2.      The Medicare program reimburses hospitals at enhanced rates when they serve a disproportionately high percentage of low-income patients. The Medicare statute conditions qualification for these enhanced rates—known as the "disproportionate share hospital" or DSH adjustment—on a formula that adds together two metrics. One of these metrics is the supplemental security income (SSI) fraction, which uses entitlement to SSI benefits—a form of welfare benefits—as a proxy for low income. A hospital's SSI fraction is calculated by dividing the number of inpatient days it spent treating patients who were "entitled to" Medicare benefits *and* who were also "entitled to" SSI benefits, by the number of inpatient days it spent treating all patients "entitled to" Medicare.

3.      The Centers for Medicare & Medicaid Services (CMS), an agency within the Department of Health and Human Services (HHS) that administers the Medicare program for the

Secretary, computes hospitals' SSI fractions annually without any input from hospitals. For purposes of the SSI fraction numerator, CMS interprets Medicare beneficiaries "entitled to" SSI benefits to include only those who, during the month of their inpatient stay, actually received an SSI cash payment. This narrow interpretation contrasts with the expansive interpretation that the Secretary—and the Supreme Court—give to the phrase "entitled to" Medicare benefits in the statutory definition of the SSI fraction, where it means eligibility for (rather than payment of) Medicare benefits.

4.      To calculate a hospital's SSI fraction, CMS obtains a customized SSI-eligibility data file from the Social Security Administration (SSA). This file shows, for all SSI-eligible individuals, whether each individual has been assigned one of three specific SSI payment status codes that CMS has selected as denoting entitlement to SSI benefits under its cramped definition. CMS then matches the individuals identified by these three codes as being entitled to SSI benefits with CMS's records of Medicare beneficiaries who received inpatient services at the hospital during the month when they received SSI payments as indicated by the CMS-designated codes.

5.      To allow hospitals to ensure that their SSI fractions are correctly calculated, Congress enacted a data disclosure mandate in Section 951 of the Medicare Prescription Drug, Improvement, and Modernization Act (MMA). This statutory mandate requires CMS to "arrange to furnish" Medicare hospitals with the "data necessary for such hospitals to compute the number of patient days used in computing" their SSI fractions. Despite this straightforward obligation to provide hospitals with the data they need to ensure that their SSI fractions are correct, CMS merely provides the end results from the match process, withholding patient-level SSI-entitlement data in the agency's possession—including data that would enable hospitals to identify patients eligible for SSI but not coded as in receipt of a cash payment under the three CMS-designated codes—that

are crucial for hospitals to access if they are to have any hope of computing their own SSI fractions and checking CMS's work. Moreover, the Secretary could, but has failed to, obtain from SSA all underlying patient-level SSI payment status codes.

6.     The Medicare statute gives hospitals the statutory right to a hearing before the Provider Reimbursement Review Board (PRRB) to appeal final determinations of their total Medicare reimbursement for a given fiscal year, including any DSH adjustments. However, because the Secretary has issued regulations that prevent hospitals from obtaining any discovery from HHS, CMS, or SSA in administrative appeals of their SSI fractions, the data necessary for a hospital to determine its true SSI fraction is not available through this appeal process, either. Without access to the patient-level SSI data that CMS refuses to share, this appeal right amounts to nothing more than a meaningless charade.

7.     Because CMS refuses to disclose the "necessary" SSI-eligibility data as required by MMA Section 951, the Hospitals here used an alternative source—the State of New Jersey Medicaid Program—to obtain data identifying additional Medicare inpatients who were entitled to SSI benefits during their inpatient hospital stays. The Hospitals used a process for obtaining surrogate SSI-eligibility data from state Medicaid agencies that this Court explicitly endorsed in *Pomona Valley Hospital Medical Center v. Azar*, 2020 WL 5816486 (D.D.C. Sept. 30, 2020), and that the D.C. Circuit subsequently approved in *Pomona Valley Hospital Medical Center v. Becerra*, 82 F.4th 1252 (D.C. Cir. 2023). From this alternative data source, the Hospitals have established a *prima facie* case that CMS significantly undercounted the patient days in their SSI fraction numerators for fiscal year (FY) 2016, with a definitive resolution of the discrepancy between CMS's calculation and the Hospitals' analysis unavailable unless and until the Secretary discloses the "necessary" SSI-eligibility data.

8.      Based on the foregoing, and as elaborated on in more detail below, the Hospitals seek an order from this Court: (a) holding unlawful and setting aside CMS's calculation of the Hospitals' SSI fractions for FY 2016, and remanding to CMS with instructions for the agency to bear the burden of overcoming the Hospitals' *prima facie* evidence of error; (b) compelling CMS to disclose to the Hospitals patient-level SSI-eligibility data obtained from SSA, and to obtain from SSA all such SSI-eligibility data and disclose it to the Hospitals; and (c) declaring that CMS's interpretation of "entitled to" SSI benefits is contrary to the Medicare statute.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f) (appeal of final agency decision regarding Medicare reimbursement), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1361 (mandamus).

10.     Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1391(e).

## PARTIES

11.     Plaintiff Hospitals are (1) Hackensack University Medical Center (Medicare Provider No. 31-0001), (2) Jersey Shore University Medical Center (Medicare Provider No. 31-0073), and (3) Raritan Bay Medical Center (Medicare Provider No. 31-0039). At all times relevant to this action, the Hospitals were eligible to participate in the Medicare program. This action addresses determinations of the Hospitals' Medicare payment for their FY starting on January 1, 2016 and ending on December 31, 2016.

12.     Defendant Xavier Becerra is sued in his official capacity as the Secretary of the Department of Health and Human Services (HHS). HHS is responsible for administering the Medicare program, which it does through the Centers for Medicare & Medicaid Services (CMS).

## BACKGROUND: THE DSH ADJUSTMENT AND SSI FRACTION

### *Medicare Part A and the Inpatient Prospective Payments System*

13.     Medicare is a federal program that provides health insurance to the elderly and disabled. 42 U.S.C. § 1395c; *Advocate Christ Med. Ctr. v. Becerra*, 80 F.4th 346, 349 (D.C. Cir. 2023). Part A of Medicare provides coverage and payment for inpatient hospital treatment. *See id*. § 1395d(a). Only Part A is at issue in this action.

14.     The Medicare program is administered by the Secretary through CMS. 42 U.S.C. § 1395kk(a); *Health Care Financing Administration Reorganization Order*, 42 Fed. Reg. 13,262 (Mar. 9, 1977). The Medicare statute grants HHS rulemaking authority to promulgate regulations to administer the Medicare program, specifying that the rulemaking process must include a public comment period of at least 60 days. 42 U.S.C. § 1395hh(a)(1), (b)(1). The statute also requires that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services" must go through this rulemaking process. *Id*. § 1395hh(a)(2). The Supreme Court has explained that this broad rulemaking requirement (a) does not apply only to the establishment or changing of rules with the force and effect of law, but could also apply to guidance that governs "payment for services," and (b) is in addition to the procedural requirements of the Administrative Procedure Act. *See Azar v. Allina Health Services*, 139 S. Ct. 1804, 1811 (2019).

15.     Medicare beneficiaries receive inpatient hospital services from healthcare providers, such as Plaintiff Hospitals, that have entered into provider agreements with HHS. These providers are reimbursed for treating Medicare beneficiaries under the Inpatient Prospective Payment System (IPPS). This is a system that fixes standard, nationwide reimbursement rates for categories of treatment, subject to various adjustments. *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 959 F.3d 1113, 1115 (D.C. Cir. 2020); *see* 42 U.S.C. § 1395ww(d)(1)-(5).

***The DSH Adjustment and the SSI Fraction***

16.     One of the hospital-specific adjustments to the IPPS reimbursement rate is the "disproportionate share hospital" (DSH) adjustment, which "gives hospitals serving an 'unusually high percentage of low-income patients' enhanced Medicare payments." *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2359 (2022) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013)); *see* 42 U.S.C. § 1395ww(d)(5)(F).

17.     The DSH adjustment is made because low-income individuals are generally more expensive to treat than higher-income patients, even for the same medical conditions. To compensate for these higher per-patient costs, and to encourage hospitals to treat low-income patients, Congress decided to provide additional reimbursement to hospitals that serve a disproportionately high proportion of low-income patients. *Empire Health*, 142 S. Ct. at 2359.

18.     The most common method by which a hospital becomes eligible for the DSH adjustment is by having a qualifying "disproportionate patient percentage" (DPP). *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I), (v)-(vi).

19.     The Medicare statute defines a hospital's DPP as the sum of two fractions that themselves are statutorily defined. *Id.* § 1395ww(d)(5)(F)(vi). These are commonly referred to as the *Medicaid* fraction and the *Medicare* fraction; the Medicare fraction is also known as the SSI fraction. *See, e.g.*, *Baystate Medical Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 22-23 (D.D.C. 2008). Those fractions are designed to be two different proxies to determine the proportion of the inpatient hospital care provided to low-income patients.

20.     The SSI fraction, which is at issue in this action, "represents the proportion of a hospital's Medicare patients who have low incomes, as identified by their entitlement to supplementary security income (SSI) benefits." *Empire Health*, 142 S. Ct. at 2359. The SSI program, established under Title XVI of the Social Security Act and administered by the Social

Security Administration (SSA), is a welfare program that provides cash payments and other benefits to financially needy individuals who are over 65, blind, or disabled. *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988); *see* 42 U.S.C. §§ 1382(a)(1).

21.     The Medicare statute defines a hospital's SSI fraction by specifying the numerator and denominator values as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for [a cost reporting period] which were made up of patients who (for such days) were entitled to benefits under [Medicare Part A] and were entitled to supplementary security income benefits (excluding any State supplementation) under [Title XVI of the Social Security Act], and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under [Medicare Part A].

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

22.     Put in plain terms, the numerator of the SSI fraction is the number of patient days attributable to patients who, at the time that they were receiving inpatient services at the hospital, were "entitled to" *both* Medicare Part A benefits *and* SSI benefits, while the denominator is the number of patient days attributable to all patients entitled to Medicare Part A benefits.

### *How CMS Calculates SSI Fractions*

23.     CMS's current methodology for calculating hospitals' SSI fractions was established in the wake of *Baystate Medical Center v. Leavitt*, in which this Court held that CMS's previous process for matching Medicare and SSI-eligibility records was arbitrary and capricious because it failed to use "the best available data" to determine the number of patients entitled to SSI benefits. 545 F. Supp. 2d 20, 57-59 (D.D.C. 2008). Shortly after acquiescing in the *Baystate* judgment, the Secretary promulgated a new final rule that revised CMS's matching process. *See Hospital Inpatient Prospective Payment Systems Changes and FY2011 Rates*, 75 Fed. Reg. 50,042, 50,275-50,285 (Aug. 16, 2010) (2010 Rule).

24.     The revised matching process relies on an interpretation of the phrase "entitled to supplementary security income benefits" in the statutory definition of the SSI fraction numerator; this interpretation includes only those patients who in fact receive cash payments under the SSI program during the relevant time period. *See Advocate Christ*, 80 F.4th at 350. Explaining its position in the 2010 Rule, CMS denied that an individual is "entitled to" SSI benefits simply by being "eligible" for the SSI program generally. Rather, the individual must "receive SSI benefits" or, equivalently, be "*paid* benefits by the Commissioner of the Social Security." *See* 75 Fed. Reg. at 50,280 (quoting 42 U.S.C. § 1381a).

25.     Under the revised matching process first set forth in the 2010 Rule, CMS relies on two main data sources to determine how many days a hospital spent giving inpatient care to Medicare beneficiaries who also received SSI cash payments during their inpatient stay. First, CMS uses files it maintains itself—specifically the Medicare Enrollment Database (EDB), which is CMS's system of records for all individuals who have ever been enrolled in Medicare (75 Fed. Reg. at 50,277), and the Medicare Provider Analysis and Review (MedPAR) file, which contains records for all Medicare hospital inpatient discharges (*id*. at 50,055)—to determine each hospital's inpatient admissions of Medicare beneficiaries.

26.     Second, CMS uses an SSI-eligibility data file, which SSA "prepares solely for" and then transmits to CMS, to identify on a month-by-month basis those SSI enrollees who have received a cash payment, as indicated by their payments status codes. *See Baystate*, 545 F. Supp. 2d at 25; 75 Fed. Reg. at 50,277. Although SSA uses dozens of payment codes to identify the status of SSI enrollees, CMS's policy as set forth in the 2010 Rule is that only three payment status codes, denoting actual receipt of a cash payment, "accurately capture[] all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits": C01 (current pay), M01 (forced

pay), and M02 (forced due). *Id*. at 50,281. The customized SSI-eligibility data file that SSA gives CMS contains binary "monthly indicators" that denote when SSI enrollees received SSI cash payments, with a "1" indicator denoting individuals with one of the three selected payment status codes; and a "0" indicator to denote individuals with any other payment status code. *See id.* at 50,276.

27.     Upon information and belief, SSA could readily include the actual payment status codes for the individuals in the annual file provided to CMS. CMS's preference for a file with only the binary monthly indicators obscures the other payment status code data to which SSA has access, including other payment status codes which would reveal which individuals were *eligible* for SSI benefits, even if they did not *receive* a cash payment in a given month. This would include beneficiaries who were entitled to an SSI payment (under the Secretary's narrow definition) but did not receive the cash payment because, for example, the beneficiary had no bank account and the Secretary therefore could not transmit the payment, or because the beneficiary owed a debt to the government that was larger than, and offset by, the SSI payment amount.

28.     CMS matches the individuals in SSA's SSI-eligibility data file with CMS's Medicare beneficiary inpatient data to determine which Medicare patients were in receipt of SSI cash payments during the months of their inpatient stay. Finally, CMS derives the numerator of a hospital's SSI fraction as the number of patient days attributable to patients identified by the matching process. *See* 75 Fed. Reg. at 50, 278, 50,281; *Pomona*, 82 F.4th at 1255.

29.     For example, if a Medicare beneficiary was an inpatient from April 29, 2016 through May 6, 2016, and, by the time the SSA file is constructed for that year, received an SSI payment for April but not for May, the days April 29 through April 30 would be counted in the numerator of the SSI fraction, but the days May 1 through May 6 would not be counted.

30.    Moreover, once CMS has performed the match of SSA's SSI-eligibility data with its own Medicare beneficiary data, the agency does not further adjust the SSI fraction based upon subsequent, retroactive corrections to the SSI payment status of a Medicare beneficiary. Thus, in the example in the paragraph above, if, after the data match was performed, SSA granted eligibility for the month of May, the days May 1 through May 6 would not be added to the numerator of the hospital's SSI fraction.

31.    As noted in ¶ 27 *supra*, there are situations where an SSI-eligible Medicare beneficiary does not receive any SSI cash payment for a particular month but, nevertheless, is indisputably in SSI-payment status for that month. For example, where payment is due but is not made in a given month because the  beneficiary (a) does not have a bank account, (b) is considered by SSA to need a representative payee but no payee has yet been designated and direct payment is prohibited under SSA policy, (c) is someone for whom SSA does not have a valid address, or (d) owes a debt to the government that is larger than, and is offset by, the SSI payment amount. Although CMS's policy is to exclude inpatient days for such individuals from the numerator of a hospital's SSI fraction because they are not assigned one of the three codes set forth above, the Secretary has effectively disavowed this policy in a recent brief filed in opposition to certiorari: "What matters is whether the individual was entitled to an SSI payment for the month, not the timing of the actual receipt of such payment." Brief for Respondent in Opp'n, *Advocate Christ Med. Center v. Becerra*, No. 23-715, at 16.

32.    The 2010 Rule does not provide for any external validation of, or way for hospitals to review meaningfully, the underlying SSI entitlement data or the matching process. While CMS does perform its own "internal validation processes," it "do[es] not intend to provide" the data produced in these processes "to the public." *See* 75 Fed. Reg. at 50,278-50,279.

***The Medicare Prescription Drug Improvement, and Modernization Act's***
***Data Disclosure Requirement***

33.     Under Section 951 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), HHS "shall arrange to furnish" hospitals participating in Medicare Part A with "the data necessary for such hospitals to compute the number of patient days used in computing" their DPPs, including their SSI fractions. Pub. L. No. 108-173 § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. § 1395ww note). Congress adopted this statutory mandate "[t]o provide for a check on HHS's work" in calculating hospitals' SSI fractions. *See Advocate Christ*, 80 F.4th at 351.

34.     To comply with MMA Section 951, CMS gives each hospital the MedPAR data for that hospital, together with "the results of the data match of SSI eligibility information." *Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates*, 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005) (2005 Rule); *see Pomona*, 82 F.4th at 1255. That is, CMS's policy—as set forth in the 2005 Rule, which the Secretary promulgated to implement MMA Section 951—is to disclose only "the matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis." 70 Fed. Reg. at 47,440. "This amounts to a list of inpatient days along with a binary yes-or-no marker indicating whether the patient for those days was counted as being entitled to SSI benefits." *Advocate Christ*, 80 F.4th at 351.

35.     But crucially, "CMS does not give hospitals the SSI eligibility file that it receives from SSA." *Pomona*, 82 F.4th at 1255. Nor does the Secretary give a hospital the full data from SSA on the hospital's patients included in the SSI fraction numerator. In the 2010 Rule, CMS reiterated its policy not to give hospitals "access to patient-level detail data, including SSI eligibility information." 75 Fed. Reg. at 50,279. And, as noted above, CMS requests from SSA an

SSI-eligibility data file that does not include the actual payment status codes for SSI-eligible individuals.

36.    During the rulemaking for the 2005 final rule, some commenters urged CMS to release the full SSI-eligibility data file provided to CMS by SSA. The commenters pointed out that access to the SSI-eligibility file is necessary for hospitals to compute their DPPs. 70 Fed. Reg. at 47,440. CMS responded by asserting that under its data use agreement with SSA, CMS is "strictly prohibited from disclosing SSI eligibility information," while SSA is in turn prohibited from disclosing this information by "Federal law and regulations." *Id*.

37.    However, because hospitals already have access to their patients' confidential financial information based on broad permissions from the patient or the patient's representative, further disclosure by CMS of the SSI eligibility data would not reveal any confidentially sensitive information to which hospitals are not already entitled—just the SSA payment status codes. And, of course, CMS routinely provides confidential information to Medicare-eligible providers in accordance with the agency's data use agreements. *See, e.g.*, CMS, Data Use Agreement (DUA) https://www.cms.gov/about-cms/information-systems/privacy/data-use-agreement-dua    ("CMS enters into Data Use Agreements (DUAs) to track the disclosure of protected health information (PHI) and/or personally identifiable information (PII).").

38.    The necessity of patient-level SSI-eligibility data for hospitals to compute the patient days used to calculate SSI fractions, which HHS is directed by MMA Section 951 to "arrange to furnish" to hospitals, is amply illustrated by the *Pomona Valley Hospital Medical Center* litigation. There, unable to obtain the underlying data from the SSI-eligibility file from either CMS or SSA, a hospital "sought to determine its Medicare fractions with data obtained from state agencies administering two benefit programs that piggyback on SSI." *Pomona*, 82 F.4th at

1256. From its analysis of the Medicaid state-agency data, the hospital was able to mount a strong *prima facie* case in administrative proceedings that CMS had significantly understated its SSI fractions due to "inaccurate transmission of data from SSA to CMS, coding errors, or other systemic problems with the matching process." *Id*. at 1257. When, in the face of this evidence produced by the hospital and without producing any countervailing evidence of its own, CMS rejected the hospital's administrative challenge to the SSI fractions calculated by CMS, the hospital sought judicial review.

39.     This Court concluded that CMS's decision was not supported by substantial evidence, since the agency had declined to produce any countervailing evidence despite that "the agency had the data that would have answered [the hospital's] allegations" and that "proving the allegations without [the data that CMS refused to disclose] would be difficult . . . if not impossible." *Pomona*, 2020 WL 5816486, at *11 (cleaned up). On appeal, the D.C. Circuit affirmed, recognizing that while the hospital "went about as far as it could, in attempting to reverse-engineer the SSI-eligibility data" from Medicaid state-agency data, "[o]nly CMS or SSA possess the SSI-eligibility data that would definitively establish the correct numerators" for the hospital's SSI fractions." *Pomona*, 82 F.4th at 1261.

40.     The experience of the hospital in *Pomona* reflects a more general truth: only with the complete SSI-eligibility data for the patients in their SSI fractions will hospitals be able to definitively determine the correct numerators for those fractions. That data is, accordingly, "necessary" for hospitals to compute their own SSI fractions and thereby to verify whether CMS correctly calculated their SSI fractions—and, by extension, correctly determined the DSH adjustment payments to which they were entitled. HHS must therefore "arrange to furnish"

hospitals with patient-level SSI-eligibility data to comply with the data disclosure requirement imposed by MMA Section 951.

## BACKGROUND: IPPS ADMINISTRATIVE AND JUDICIAL REVIEW PROCESS
### *Administrative and Judicial Review of IPPS Reimbursement Payment Determinations*

41.     Final determinations about how much IPPS payment a hospital is owed for a given fiscal year are made by the hospital's assigned Medicare administrative contractor (MAC), which acts on behalf of CMS. *See* 42 U.S.C. § 1395h. At the close of a hospital's fiscal year, the hospital files a cost report with the MAC showing the costs the hospital incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The MAC reviews the report and issues a Notice of Program Reimbursement (NPR) setting forth its final determination of the total amount of Medicare payment due to the hospital. 42 C.F.R. § 405.1803.

42.     Although a hospital's MAC uses the hospital's SSI fraction to determine its DPP and eligibility for a DSH adjustment, the calculation of a hospital's SSI fraction does not depend on any information filed in its cost report. Rather, the MAC relies on CMS's calculation of the hospital's SSI fraction, which is performed unilaterally by CMS without any input from hospitals.

43.     If a hospital is dissatisfied with the MAC's final determination of the total amount of IPPS reimbursement due the hospital, as reflected in the NPR, and the disputed amount satisfies the amount-in-controversy threshold, the Medicare statute grants the hospital a right to obtain a hearing before the Provider Reimbursement Review Board (PRRB) by filing an appeal within 180 days of receiving its NPR. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835(a).

44.     Upon receiving the PRRB's final decision, hospitals have a right to seek judicial review of that decision by filing suit within 60 days in the United States District Court for the judicial district in which the hospital is located, or in the United States District Court for the District of Columbia. 42 U.S.C. § 1395oo(f)(1).

45.     The PRRB is bound by, and hence lacks the authority to adjudicate the validity of, the Medicare statute, regulations under the Medicare statute, and CMS Rulings issued under the authority of the CMS Administrator. The PRRB must also "afford great weight" to guidance documents issued by CMS. *See* 42 C.F.R. § 405.1867.

46.     Because the PRRB lacks authority to adjudicate the validity of the Medicare statute or regulations promulgated under it, where a hospital is entitled to a PRRB hearing, the hospital may request that the PRRB determine that it lacks authority to decide a question of law or regulations relevant to the appeal. If the PRRB makes this determination, it must certify the case for expedited judicial review (EJR). 42 U.S.C. § 1395oo(f)(l); 42 C.F.R. § 405.1842. In the event that the PRRB grants EJR, the hospital may file suit in federal district court seeking judicial review within 60 days. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842(g)(2).

### *Lack of Meaningful Administrative Review of SSI Fraction Calculations*

47.     CMS has specifically acknowledged that the PRRB appeal process should afford hospitals a procedure to challenge the agency's calculation of their SSI fractions, and hence their DSH adjustment payments, as erroneous. In the 2005 Rule, several commenters suggested that CMS establish a process for a hospital to "submit additional days that it believes were omitted in error from the SSI/MedPAR system data match." 70 Fed. Reg. at 47,441. In response, CMS pointed to a hospital's "right to appeal" the MAC's "determination regarding the final amount of Medicare DSH payment to which it is entitled . . . in accordance with the procedures set forth in the regulations . . . concern[ing] provider payment determinations and appeals." *Id.*

48.     However, in 2008, the Secretary revised the regulations governing PRRB appeals to effectively cut off these rights when it comes to appealing the Secretary's unilaterally determined SSI fractions and resulting Medicare DSH payments, making it futile for hospitals to

exhaust their administrative remedies in seeking review of CMS's determinations of their SSI fractions. *See Medicare Program; Provider Reimbursement Determinations and Appeals*, 73 Fed. Reg. 30,190 (May 23, 2008) (2008 Rule). These revisions have even greater restrictive effect where, as here, the hospitals' challenge to CMS's calculations requires analyzing data to which only CMS and/or SSA have access and that the agencies refuse to disclose to the hospitals.

49.     Two provisions in the revised PRRB regulations work together to thwart hospitals' right to appeal erroneous calculations of their SSI fractions. First, the 2008 Rule reaffirmed the longstanding rule that "neither the Secretary nor CMS may be made a party to proceedings in a [PRRB] appeal." 73 Fed. Reg. at 30,215-30,216; 42 C.F.R. § 405.1843(b). Second, the revised regulations bar discovery from CMS, HHS and any other federal agency. *See* 42 C.F.R. § 405.1853(e)(2) (permitting hospitals to request production of documents only from another party or "a nonparty other than CMS, the Secretary or any Federal agency"); *id.* § 405.1857 (authorizing the PRRB to issue subpoenas to a party or "a nonparty other than CMS or the Secretary or any Federal agency"). The combined effect of these provisions is to preclude hospitals from obtaining discovery from HHS, CMS or SSA regarding the SSI-eligibility data that hospitals need to verify CMS's calculation of their SSI fractions and the resulting DSH adjustment payments.

50.     Upon information and belief, in PRRB appeals challenging SSI fractions governed by the Secretary's 2008 revised PRRB regulations, neither HHS, CMS, nor SSA has ever provided, nor would ever voluntarily provide, the MAC with the SSI-eligibility data that CMS used to determine the hospital's SSI fraction so that the MAC could disclose that data to the hospital and/or introduce that data into evidence.

### *Channeling Judicial Review of Certain Medicare Claims*

51.     As made applicable to the Medicare statute (*see* 42 U.S.C. § 1395ii), 42 U.S.C. § 405(h) divests the district courts of federal-question jurisdiction to hear "any claim arising under" the Medicare statute, and bars any "decision of the [Secretary of HHS]" from being judicially reviewed, "except as herein provided."[1]

52.     The exception "herein provided" is created by 42 U.S.C. § 405(g). This provision, although not expressly incorporated into the Medicare statute under § 1395ii, has been treated by the Supreme Court as such. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 7-9 (2000); *Heckler v. Ringer*, 466 U.S. 602, 614-615 (1984); *see also Am. Hosp. Ass'n v. Azar*, 895 F.3d 822 (D.C. Cir. 2018). Section 405(g), as made applicable to the Medicare statute, authorizes any person to file a civil action, "after any final decision of the [Secretary of HHS] made after a hearing to which he was a party," to "obtain a review of such decision" in federal district court.

53.     Courts have interpreted Section 405(g) to impose two requirements for obtaining judicial review of Medicare claims. The first, which is jurisdictional and hence not waivable, requires that the plaintiff have "presented" the claim to the Secretary of HHS. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976); *Am. Hosp.*, 895 F.3d at 825. The second, which is waivable, is that the plaintiff must have exhausted the "administrative remedies prescribed by the Secretary." *Mathews*, 424 U.S. at 328; *Am. Hosp.*, 895 F.3d at 826.

54.     The D.C. Circuit has held that the futility of exhausting the administrative review process may be an independently sufficient ground for waiver of the exhaustion requirement. *See Tataranowicz v. Sullivan*, 959 F.2d 268, 275 (D.C. Cir. 1992). Exhaustion of the administrative

---

[1]     The Supreme Court has held, however, that "§ 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986).

review process may be futile where, for example, there are no facts in dispute and the only issue is a purely legal question. *See id*. at 274. Waiver of exhaustion is proper where judicial resolution of the claim at issue "(1) will not interfere with the agency's efficient functioning; (2) will not thwart any effort at self-correction; (3) will not deny the court or parties the benefit of the agency's experience or expertise; and (4) will not curtail development of a record useful for judicial review." *Id*. at 275.

### *Judicial Review Under the Mandamus Act*

55.     The Mandamus Act grants district courts jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

56.      In the D.C. Circuit, jurisdiction under the Mandamus Act is available even in circumstances where federal-question jurisdiction or other statutory jurisdiction would be precluded by 42 U.S.C. § 405(h). *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001) ("joining the virtual unanimity of circuit courts" holding "that § 1361 jurisdiction is not barred" by Section 405(h)). Courts have emphasized that mandamus jurisdiction is particularly appropriate where the plaintiff brings a procedural challenge unrelated to substantive questions of entitlement to Medicare benefits. *See Burnett v. Bowen*, 830 F.2d 731, 738 (7th Cir. 1987); *Lopez v. Heckler*, 725 F.2d 1489, 1507 (9th Cir. 1984), *vacated and remanded on other grounds*, 469 U.S. 1082 (1984); *Belles v. Schweiker*, 720 F.2d 509, 512-513 (8th Cir. 1983).

57.     Jurisdiction under the Mandamus Act is available if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). If all jurisdictional requirements

are met, a court may grant relief under 28 U.S.C. § 1361 "when it finds compelling equitable grounds." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (quoting *Medicare Reimbursement*, 414 F.3d at 10).

## FACTUAL ALLEGATIONS

58.     CMS calculated the SSI fractions for the Hospitals' FY 2016, presumably applying—albeit with unknown accuracy given CMS's refusal to disclose the underlying data—the revised data matching methodology set forth in the 2010 Rule.

59.     The Hospitals timely filed PRRB appeals from their FY 2016 NPRs containing CMS's determinations of their FY 2016 DSH payments and SSI fractions. Their appeals are included in a single "common issue related party" or CIRP group appeal.  The Hospitals' FY 2016 group appeal meets all requirements for PRRB jurisdiction.

60.     In light of CMS's policy of refusing to disclose the full SSI-eligibility data held by SSA needed to definitively verify CMS's calculations, similar to *Pomona*, the Hospitals obtained data from the New Jersey Medicaid agency—data that the New Jersey Medicaid agency received directly from SSA—that shed light on the SSI eligibility status of the Hospitals' patients in the denominator of their SSI fractions for FY 2016. Upon analysis, this data revealed *prima facie* evidence that CMS materially undercounted the number of SSI-matching inpatient days for purposes of determining the numerators of the Hospitals' SSI fractions.

61.     The New Jersey Medicaid data contains "Program Status codes," assigned to individuals who were the Hospitals' Medicare inpatients, that designate the individuals as being automatically enrolled in Medicaid based on their SSI enrollment. Comparing the number of SSI-matching days identified by CMS with the number of days indicated by the New Jersey Medicaid agency data reveals a discrepancy of several hundred inpatient hospital days that CMS failed to include, strongly suggesting—even if not definitively establishing—an undercount by CMS.

62.     Specifically, an analysis of Hackensack University Medical Center's FY 2016 SSI-eligibility data as received from the New Jersey Medicaid agency produced *prima facie* evidence that 408 patient days were improperly left out of the hospital's SSI fraction numerator. The inclusion of these additional patient days would mean that the hospital's SSI fraction for FY 2016 was 6.88%, not 6.39% as CMS computed. Applying a 6.88% SSI fraction would have resulted in additional DSH adjustment payments of around $162,000.

63.     A similar analysis of Jersey Shore University Medical Center's FY 2016 data revealed a presumptive undercount of 575 patient days. The data obtained from the New Jersey Medicaid agency thus suggests that the hospital's proper SSI fraction for FY 2016 was 5.15%, not the 4.39% calculated by CMS. CMS's erroneous calculation of the hospital's SSI fraction would have resulted in a DSH underpayment of an estimated $241,000.

64.     Analysis of the New Jersey Medicaid agency data likewise uncovered *prima facie* evidence of undercounting—by 635 patient days—in CMS's calculation of the FY 2016 SSI fraction numerator for Raritan Bay Medical Center. With these additional patient days are factored into the numerator, the correct FY 2016 SSI fraction for this hospital would be 14.3% rather than the 12.58% that CMS calculated. The surrogate SSI-eligibility data the Hospitals obtained thus suggest that Raritan Bay Medical Center received $181,000 less in DSH adjustment payments than it was due.[2]

---

[2]   The Hospitals acknowledge the possibility that a small number of the additional patient days that they identified using the data they obtained from the New Jersey Medicaid agency could in fact reflect circumstances where the patient received only state-level supplemental payments, without federal SSI payments. Any such patient days would not be properly included in the Hospitals' SSI fraction numerators and hence not indicate an undercount by CMS in calculating the Hospitals' SSI fractions. Only the patient-level SSI-eligibility data, which CMS has refused to disclose to the Hospitals, can definitively resolve the extent of CMS's undercount. Nevertheless, even without the benefit of the data necessary to definitively calculate the Hospitals' SSI fractions,

65. Despite the Hospitals' right, as established by the Medicare statute and its implementing regulations, to challenge CMS's determinations of reimbursement amounts due to hospitals through the PRRB appeals process, and CMS's own acknowledgement that the PRRB appeals process gives a hospital "the right to appeal" if it "disagrees with the [MAC's] determination regarding the final amount of Medicare DSH payment to which it is entitled," including based on "error[s] from the SSI/MedPAR system data match," (70 Fed. Reg. at 47,441), CMS has rendered the Hospitals' appeal rights meaningless by blocking their access to the patient-level SSI-eligibility data necessary to determine and adjudicate the accuracy of their SSI fractions and the resulting DSH payments.

66. The Hospitals cannot obtain the data they need to meaningfully present their case before the PRRB from CMS because CMS defies its obligation under MMA Section 951 to provide them with this "necessary" data. The Hospitals are also prohibited from obtaining the data they need to check CMS's calculations by using discovery procedures in the context of PRRB appeals. *See* ¶¶ 33-35; 47-50, *supra*.

67. The only data that CMS is willing to share with the Hospitals is the MedPAR Limited Data Set files. But this data fall far short of what is "necessary" to allow the Hospitals to determine whether CMS's SSI fractions are correct. The MedPAR Limited Data Set includes only CMS's *final* match results, which simply reveals binary information about which patients were identified by CMS as being entitled to both Medicare benefits and SSI benefits, and which were not. This data provides almost no additional insight into CMS's data matching process over its ultimate determination of the Hospitals' SSI fractions: in particular, it does not come close to

---

the New Jersey Medicaid agency data present strong *prima facie* evidence of undercounting. *See Pomona*, 82 F.4th at 1259-1261.

providing enough information to allow the Hospitals to determine if patients that were coded as not entitled to SSI benefits were in fact so entitled even under CMS's erroneous interpretation of "entitled to"—and it certainly does not permit review of whether patients may have been entitled to SSI benefits without actually receiving them. Through this limited disclosure, CMS shields from the Hospitals information that is "necessary" for them to verify that their SSI fractions have been correctly calculated.

68.     Because the Hospitals are blocked by CMS's policy, as set forth in the agency's regulations and guidance documents, from accessing data "necessary" for them to calculate their SSI fractions and hence to verify the accuracy of CMS's calculations, they are unable to meaningfully challenge CMS's determinations of the SSI fractions in PRRB proceedings. CMS's refusal to disclose "necessary" data under MMA Section 951 is compounded by (a) the bar on discovery against HHS, CMS, and SSA in PRRB hearings; and (b) the PRRB's obligation to abide by the Secretary's regulations and CMS Rulings, and to "afford great weight" to CMS policies, including its erroneous interpretations of being "entitled to" SSI benefits and of the data disclosure requirement under MMA Section 951. These factors, taken together, make it futile for the Hospitals to pursue further administrative exhaustion of their challenge to CMS's calculation of their FY 2016 SSI fractions, as they effectively prevent the Hospitals from obtaining any relief or even developing the relevant factual record through administrative proceedings.

## CLAIMS FOR RELIEF

### Count I
### CMS's Calculation of the Hospitals' FY 2016 SSI Fractions Was Unlawful
### (42 U.S.C. §§ 405(g), 1395oo(f)(1); 5 U.S.C. § 706(2)(A), (C), (D), (E))

69.     The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

70.     The Hospitals seek judicial review under 42 U.S.C. §§ 405(g) & 1395oo(f)(1) of CMS's calculation of their SSI fractions for FY 2016. The Hospitals challenge CMS's calculation of their FY 2016 SSI fractions as unlawful on multiple grounds.

71.     *First*, even assuming the facial validity of CMS's methodology for identifying patients "entitled to" SSI benefits (*but see infra*), the agency's calculation of the numerators of the Hospitals' SSI fractions for FY 2016 using that interpretation must be aside as unsupported by substantial evidence because CMS applied its own methodology erroneously.

72.     As discussed above (*see* ¶¶ 62-64), the Hospitals' analysis of data they obtained from the New Jersey Medicaid agency has revealed discrepancies between the number of patients "entitled to" SSI benefits for FY 2016, as inferred from the data the Hospitals obtained, compared with the number of patients that CMS's final matching data identifies as "entitled to" SSI benefits. The Hospitals' analysis of the surrogate SSI-eligibility data obtained from the New Jersey Medicaid agency constitutes powerful *prima facie* evidence that CMS has failed to include several hundred patient days that should be included in the Hospitals' SSI fraction numerators for FY 2016, even by the lights of its own, overly restrictive, interpretation of the statutory formula. Based on this strong *prima facie* showing of material undercounting of SSI-entitled days, this Court should set aside CMS's calculation of the Hospitals' SSI fractions for FY 2016, as included in their MACs' NPR, as unsupported by substantial evidence. *See Pomona*, 82 F.4th at 1258-1260.

73.     *Second*, in calculating the Hospitals' SSI fractions for FY 2016, CMS followed a methodology, first announced in the 2010 Rule, that relied on an erroneous interpretation of the statutory formula defining the SSI fraction numerator. That statutory definition requires CMS to include in the numerator days attributable to patients who are both "entitled to benefits under [Medicare Part A]" and "entitled to [SSI] benefits." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The

Supreme Court has held that the phrase "entitled to benefits under [Medicare Part A]" refers to "all those qualifying for the program, regardless of whether they are receiving Medicare payments for part or all of a hospital stay." *Empire Health*, 142 S. Ct. at 2368. This interpretation of "entitled to benefits under [Medicare Part A]," the Court added, "gives the 'entitled' phrase the same meaning it has throughout the Medicare statute." *Id*.

74.     But CMS does *not* interpret "entitled to [SSI] benefits" to mean "all those qualifying for the [SSI] program, regardless of whether they are receiving [SSI] payments for part or all of a hospital stay." *Id*. Instead, it interprets "entitled to [SSI] benefits" precisely in the way that the Court in *Empire Health* declined to read "entitled to benefits under [Medicare Part A]"— to denote only those patients who receive SSI cash payments during their inpatient stay. Moreover, the Secretary effectively disavowed this interpretation in the opposition to certiorari in *Advocate Christ*. Brief for Respondent in Opp'n, *Advocate Christ Med. Ctr. v. Becerra*, No. 23-715 (U.S.), at 16.

75.     CMS's cramped interpretation of the phrase "entitled to [SSI] benefits" therefore gives the "entitled to" phrase a *different* meaning than the "meaning it has throughout the Medicare statute." *Id*. Because the methodology CMS followed in calculating the Hospitals' SSI fractions for FY 2016 relied on this erroneous interpretation of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), CMS acted in excess of statutory authority when it used that methodology to determine the Hospitals' SSI fractions, in violation of 5 U.S.C. § 706(2)(C).[3] Moreover, in light of *Loper Bright Enterprises*, CMS's construction is entitled to no deference whatsoever—rather, the sole question is the "best" reading of the statutory language. *Loper Bright*, slip op. at 23.

---

[3]     The D.C. Circuit in *Advocate Christ* upheld CMS's interpretation of the statutory language (80 F.4th at 352-354)—but the Supreme Court recently granted certiorari to review that question. *See* Order, *Advocate Christ Med. Ctr. v. Becerra*, No. 23-715 (U.S. June 10, 2024).

76.    *Third*, even assuming—counterfactually—that CMS's narrow interpretation of "entitled to [SSI] benefits" were not erroneous, CMS's methodology applying this interpretation is also unlawful because it is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). CMS's revised data matching process, as set forth in the 2010 Rule, excludes days when a beneficiary is indisputably entitled to an SSI payment but there merely is an obstacle to delivery of the payment to the beneficiary or when the SSI payment amount owed to the beneficiary is offset by a debt the beneficiary owes the government. CMS has provided no reasoned explanation for why it uses a data matching process that will inevitably exclude certain days attributable to patients who are "entitled to [SSI] benefits" even under CMS's own impermissibly narrow interpretation of that statutory phrase.

77.    *Finally*, CMS's reliance on its improperly restrictive interpretation of "entitled to [SSI] benefits" in calculating the Hospitals' FY 2016 SSI fractions was unlawful for a further reason: that interpretation has not properly been codified in a regulation. The Medicare statute mandates that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services" must be "promulgated by the Secretary [of HHS] by regulation." 42 U.S.C. § 1395hh(a)(2). CMS's interpretation of the statutory formula that determines eligibility for DSH adjustments to hospitals' IPPS reimbursements is a substantive legal standard that governs "the payment of services." *See Allina*, 139 S. Ct. at 1811. But CMS's cramped interpretation was only announced in the regulatory preamble of the 2010 Rule: it was not part of the regulation actually codified in the Code of Federal Regulations. *See, e.g.*, *AT&T Corp. v. FCC*, 970 F.3d 344, 350-351 (D.C. Cir. 2020) ("[A]gency statements having general applicability and legal effect are to be published in the Code of Federal

26

Regulations." (cleaned up)). As such, CMS's reliance on the improperly adopted interpretation to calculate hospitals' SSI fractions—including the Hospitals' FY 2016 SSI fractions—is unlawful.

78.     As required by the Medicare statute's channeling provision, the Hospitals initially "presented" their claim challenging as unlawful CMS's calculation of their SSI fractions for FY 2016 by timely filing an appeal with the PRRB after they received their NPRs for FY 2016 from their MACs. *See* 42 U.S.C. § 1395ii; *id.* § 405(h); *Am. Hosp.*, 895 F.3d at 825.

79.     The Hospitals' appeals pressing their objections to CMS's calculation of the FY 2016 SSI fractions remain pending before the PRRB. In seeking judicial review while their PRRB appeals are still pending, the Hospitals arguably have not exhausted the administrative review process set forth in 42 U.S.C. § 1395oo(f)(1), which normally provides for judicial review only of a "final decision" of the PRRB, and provides for direct judicial review of a MAC's reimbursement determination only if a hospital has requested for, and been granted, EJR.

80.     But where, as here, exhausting the administrative review process would be futile, the district court may waive the exhaustion requirement. *Tataranowicz*, 959 F.2d at 275. Waiver of exhaustion is proper where judicial resolution of the claim at issue "(1) will not interfere with the agency's efficient functioning; (2) will not thwart any effort at self-correction; (3) will not deny the court or parties the benefit of the agency's experience or expertise; and (4) will not curtail development of a record useful for judicial review." *Id*. at 275.

81.     As discussed above, the combined effect of two actions by the Secretary have rendered CMS's data matching process an impenetrable black box, blocking the Hospitals from obtaining data that they need to verify the accuracy of the SSI fractions calculated by the agency and thereby to produce evidence of any errors in CMS's calculations. And without any ability to obtain the evidence needed to challenge those calculations, appealing to the PRRB for purposes of

challenging CMS's calculations and obtaining the proper amount of DSH adjustment payments would be utterly futile.

82.   First, the Secretary's cramped interpretation of the data disclosure obligations under MMA Section 951 mean that it is CMS policy to refuse to share with the Hospitals the full, patient-level SSI-eligibility data that is "necessary" for the Hospitals to compute their SSI fractions. While CMS shares data indicating the final match results of the agency's data matching process, that data falls far short of the information the Hospitals need to determine if CMS's calculation of their FY 2016 SSI fractions is in error. *See* ¶¶ 33-40, *supra*.

83.   Compounding CMS's refusal to properly comply with its obligations under MMA Section 951 is the Hospitals' inability to make up for this refusal by resorting to discovery mechanisms within the PRRB appeal process. The regulations governing PRRB appeals effectively bar the Hospitals from obtaining discovery against HHS, CMS, and SSA. 42 C.F.R. §§ 405.1843(b), 405.1853(e)(2), 405.1857; *see* ¶¶ 47-50, *supra*. Even if the Hospitals were to continue pursuing their PRRB appeals, therefore, the regulations that govern such appeals have stripped them of any mechanism to obtain the complete SSI-eligibility data that is essential for them to meaningfully present their case to the PRRB.

84.   Further pursuit of their PRRB appeals—that is, exhaustion of the administrative remedies set forth under 42 U.S.C. § 1395oo(f)(1)—is therefore futile. Given its futility here, the exhaustion requirement should be waived. *See Tataranowicz*, 959 F.2d at 275. Moreover, waiver of exhaustion will not thwart any efforts by CMS at self-correction, nor deny the court or parties the benefit of the agency's experience or expertise, nor curtail development of a factual record for judicial review. *Id.* If anything, meaningful development of the relevant facts regarding the

accuracy of CMS's SSI fraction calculations will only come about if the Court grants the Hospitals the relief they seek.

**Count II**
**Mandamus Act (28 U.S.C. § 1361)**

85.     The Hospitals hereby incorporate by reference all preceding paragraphs of this Complaint.

86.     Under the Mandamus Act (28 U.S.C. § 1361), federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Jurisdiction under the Mandamus Act is available if the plaintiff has a clear right to relief, the defendant has a clear duty to act, and there is no other adequate remedy available to the plaintiff. *See In re Medicare Reimbursement Litig.*, 414 F.3d at 10. A defendant has a clear duty to act where "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) (quoting *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).

87.     In MMA Section 951, Congress has clearly and expressly instructed HHS to "arrange to furnish" hospitals with "the data necessary for [them] to compute the number of patient days used in computing" their DPPs, including their SSI fractions. This statutory provision imposes a ministerial, non-discretionary duty to disclose whatever data is "necessary" for the Hospitals to compute the number of patient days used to calculate their SSI fractions.

88.     The only data that CMS has disclosed to the Hospitals regarding their FY 2016 SSI fractions is CMS's final match results, which reveals only which patients were identified by CMS as being entitled to both Medicare benefits and SSI benefits. The Secretary refuses even to provide the data that it received from SSA on all of the other Medicare inpatients who were eligible for

29

SSI, but did not receive a cash payment in a given month. This data the Secretary has provided is not sufficient for the Hospitals to "*compute*" the number of patient days properly used in calculating their SSI fractions; rather, it simply *tells* the Hospitals the number of days CMS used to compute their SSI fractions. By giving the Hospitals only this final matching data, the agency is violating a clear duty to them under MMA Section 951 by depriving them by data to which they have a clear statutory right.[4]

89.     The Hospitals have no adequate alternative remedy to this Court's mandamus relief. As already explained, administrative review through the PRRB hearing process is futile in this context due to the inability to obtain the necessary data, and hence not an adequate alternative. Because regulations governing PRRB hearings prohibit discovery against HHS, CMS and other federal agencies, the Hospitals are barred from obtaining the data they need to compute their SSI fractions for FY 2016 through discovery. More broadly, the relief the Hospitals seek is access to information that is necessary precisely *to enable them* to properly present their challenge to their SSI fractions before the PRRB. The PRRB appeal process does not provide an adequate forum to contest CMS's actions that prevent the Hospitals from meaningfully making their case before the PRRB.

---

[4]     A similar claim was rejected by the D.C. Circuit in *Advocate Christ* on the basis that the plaintiffs were asking for "data that [CMS] never received from CMS in the first place." *Advocate Christ*, 80 F.4th at 354-355. Here, plaintiffs seek data that CMS *does* have: the SSI data file it uses in its matching calculations. *See* 75 Fed. Reg. at 50,278 (describing the "SSI eligibility data file" used in the post-2010 "revised match process"). Moreover, plaintiffs preserve the argument that CMS's duty under MMA Section 951 to "arrange to furnish [to hospitals] the data necessary to compute" the SSI fraction (Pub. L. 10-173, § 951) is not bounded by what information is already in CMS's possession. Indeed, if CMS does not receive additional data from SSA, that is only because it does not ask SSA for that data; the agency's choices in this respect do not control what information is "necessary" for a hospital to perform the relevant calculations. And, if CMS's regulatory process is inconsistent with a statutory obligation, the statute of course must govern.

90.     This Court should therefore exercise its mandamus jurisdiction to compel CMS to share with the Hospitals the full SSI-eligibility data that it possesses, and to obtain from SSA and disclose to the Hospitals the underlying SSI payment status codes for each SSI eligible individual included in the denominators of the Hospitals' SSI fractions, which the Hospitals need to compute the patient days in their SSI fractions for FY 2016. 28 U.S.C. § 1361; *see also id*. § 1651(a) (All Writs Act).

## REQUEST FOR RELIEF

The Hospitals respectfully request that this Court enter an order:

1.      Holding unlawful and setting aside CMS's calculation of the Hospitals' SSI fractions for FY 2016, and directing that, on remand, CMS shall have the burden of providing either countervailing evidence or valid legal grounds to overcome the Hospitals' *prima facie* evidence of error;

2.      Compelling CMS (a) to disclose to the Hospitals patient-level SSI-eligibility data obtained from SSA; and (b) to obtain from SSA the complete SSI-eligibility data for all of the patients included in the Hospitals' SSI fractions, and to disclose the data thus received from SSA to the Hospitals;

3.      Declaring that CMS's interpretation of "entitled to" SSI benefits is contrary to statute (*see* 28 U.S.C. § 2201(a) (Declaratory Judgment Act)); and

4.      For the Hospitals' costs and reasonable attorney's fees, and for such other and further relief that the Court deems appropriate.

Dated: June 28, 2024

Respectfully submitted,

/s/ *Paul W. Hughes*

Robert L. Roth (D.C. Bar No. 441803)
HOOPER LUNDY & BOOKMAN, P.C.
401 9th Street NW, Suite 550
Washington, DC 20004
(202) 580 7700
rroth@hooperlundy.com

Paul W. Hughes (D.C. Bar. No. 997235)
Andrew A. Lyons-Berg (D.C. Bar. No. 230182)
Caleb H. Yong (*pro hac vice* to be filed)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756 8000
phughes@mwe.com

Sven Collins (D.C. Bar No. C00093)
HOOPER LUNDY & BOOKMAN, P.C.
999 18th Street, Suite 3000
Denver, CO 80202
(720) 687 2850
scollins@hooperlundy.com

Emily Jane Cook (*pro hac vice* to be filed)
MCDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
(310) 284 6113
ecook@mwe.com

*Counsel for Plaintiffs*