## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HMH HOSPITALS CORPORATION, dba HACKENSACK UNIVERSITY MEDICAL CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br><br> Defendant. | Civil Action No. 24-1901 (BAH) <br><br> Judge Beryl A. Howell |

| | |
|---|---|
| HMH HOSPITALS CORPORATION, dba HACKENSACK UNIVERSITY MEDICAL CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br><br> Defendant. | Civil Action No. 24-cv-3261 (BAH) <br><br> Judge Beryl A. Howell |

## MEMORANDUM OPINION

The Medicare Act, *see* 42 U.S.C. §§ 1395 *et seq.*, sets forth a "reticulated statutory scheme" that imposes stringent administrative channeling and exhaustion requirements. *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 667 (1986). In this consolidated action, a small group of hospitals filed two suits against defendant, the Secretary of Health and Human Services ("HHS") in his official capacity, alleging that defendant's calculation of their supplemental security income ("SSI") fractions for Fiscal Year ("FY") 2015 and FY 2016

1

resulted in underpayments by Medicare's reimbursement program.  *See HMH Hospitals Corp., et al. v. Becerra*, No. 24-cv-1901 (D.D.C.) ("*HMH I*") (challenging FY 2016 calculations); *HMH Hospitals Corp., et al. v. Becerra*, No. 24-cv-3261 (D.D.C.) ("*HMH II*") (challenging FY 2015 calculations).

In the first of these consolidated actions, *HMH I*, plaintiffs concede that they have not received a final decision in their administrative appeal pending before the Provider Reimbursement Review Board ("the Board").  *See HMH I* Compl. ¶ 79.  In the second of these consolidated actions, *HMH II*, plaintiffs twice asked the Board to allow them to seek judicial review before receiving a final Board decision, a mechanism under the Medicare statute known as expedited judicial review ("EJR"), but the Board denied plaintiffs' requests on procedural and factual grounds.  Despite receiving neither a final decision from the Board nor permission to seek EJR, plaintiffs filed two suits in federal court and challenged the reimbursement determinations for FY 2015 (in *HMH II*) and FY 2016 (in *HMH I*).  Defendant moved to dismiss the case for lack of subject matter jurisdiction and failure to state a claim, and both sides cross-moved for summary judgment.

This Court lacks subject matter jurisdiction over plaintiffs' substantive claims challenging their SSI fraction reimbursements in FY 2015 and FY 2016, due to plaintiffs' failure to exhaust their administrative remedies, which failure is not excused by futility.  Though plaintiffs sought EJR for their FY 2015 SSI fraction reimbursement challenge, the Board's denial is not a "final decision" subject to judicial review.  *See* 42 U.S.C. § 405(g).  Nor is plaintiffs' request for mandamus relief to obtain certain data from HHS supported by a clear right to relief or defendant's duty to act.  Accordingly, plaintiffs' Complaints seeking relief, under the Medicare Act, 42 U.S.C. §§ 405(g), 1395*oo*(f)(1), and the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2), *see HMH II* Compl. ¶¶ 77-80 (Count 1), ECF No. 1, *HMH I* Am. Compl. ¶¶ 79-94 (Count 1), ECF No. 16, are dismissed for lack of subject matter jurisdiction, and their requests for relief, under the Mandamus Act, 28 U.S.C. § 1361, *see HMH II* Compl. ¶¶ 81-86 (Count 2), *HMH I* Am. Compl. ¶¶ 95-100 (Count 2), are dismissed for failure to state a claim. The parties' respective motions for summary judgment are denied as moot.

## I.    BACKGROUND

"Resolving the instant motions requires navigating the 'labyrinthine world' of Medicare reimbursements." *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 124 (D.D.C. 2021) (BAH), *aff'd*, 61 F.4th 999 (D.C. Cir. 2023) (quoting *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 694 (D.C. Cir. 2014)). To aid understanding, the following sections describe the Medicare Act's administrative and judicial review scheme, the key statutory and regulatory provisions, and the factual and procedural background underlying the challenged agency actions.

### A.    Statutory and Regulatory Framework

#### 1.    *Review of Medicare Reimbursement Determinations*

The Medicare Act, enacted in 1965 as Title XVIII of the Social Security Act, established a federal program that provides health insurance for the elderly and disabled. *See* Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (codified as amended at 42 U.S.C. §§ 1395 *et seq.*). In establishing Medicare, "Congress enacted a 'reticulated statutory scheme' 'detail[ing] the forum and limits of review' of all claims for Medicare benefits." *Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1140 (D.C. Cir. 2024) (quoting *Michigan Acad. of Fam. Physicians*, 476 U.S. at 675). Generally, any challenges to a Medicare reimbursement decision must "first be raised and exhausted" before the agency pursuant to the "'special review system' specifically designed for Medicare claims." *Id.* at 1142 (quoting *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 8 (2000)). The purpose of administrative presentment and exhaustion is

to "assure[] the [Secretary] greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts." *Illinois Council*, 529 U.S. at 13.  To that end, Section 405(h) of the Medicare Act strips courts of all jurisdiction to review decisions of the Secretary "except as [t]herein provided" by Section 405(g) of the Medicare Act.  42 U.S.C. § 405(h); *see also Illinois Council*, 529 U.S. at 10 ("Section 405(h) purports to make exclusive the judicial review method set forth in § 405(g).").  Under Section 405(g), a party may obtain judicial review only after a "final decision of the [Secretary] made after a hearing to which he was a party."  42 U.S.C. § 405(g).

The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS") on behalf of the Secretary.  42 U.S.C. § 1395kk(a).  CMS in turn contracts with intermediaries known as Medicare administrative contractors—often insurance companies—who help with processing claims and administering benefits.  *See Battle Creek Health Sys. v. Kennedy*, No. 23-5310, 2025 WL 2423686, at *2 (D.C. Cir. Aug. 22, 2025); *see also* 42 U.S.C. § 1395kk-1.  A provider dissatisfied with an adverse Medicare reimbursement decision that also satisfies a statutory amount-in-controversy requirement may appeal the Medicare contractor's decision to the Board, an administrative body appointed by the Secretary. *See* 42 U.S.C. § 1395*oo*(a)(1)(A)(i), (2)-(3), (d) & (h).  The Board decision "shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision."  42 U.S.C. § 1395*oo*(f)(1); *see also* 42 C.F.R. § 405.1875 (reflecting that the Secretary has delegated his authority to reverse, affirm, or modify to the Administrator of CMS).  "[W]ithin 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received," providers "shall have the right to obtain judicial

review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced [in federal district court]."  42 U.S.C. § 1395*oo*(f)(1).

As relevant here, the Medicare statute includes an exception to the requirement that hospitals receive a "final decision" from the Board to obtain judicial review.  Pursuant to 42 U.S.C. § 1395*oo*(f)(1), a provider may file a request with the Board for EJR "of any action of the [Medicare contractor] which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider . . . ) that it is without authority to decide the question."  A provider may commence "a civil action . . . within sixty days of the date on which notification of such determination is received."  42 U.S.C. § 1395*oo*(f)(1).  If the Board fails to render a determination as to whether it has authority to decide the question presented within 30 days, "the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing."  *Id.*  EJR serves to reduce "delay[s]" in the resolution of controversies and relieve providers from the obligation to "pursue a time-consuming and irrelevant administrative review" whenever the Board finds "that it is without authority to decide the question."  H.R. Rep. No. 96-1167, at 394 (1980), 1980 U.S.C.C.A.N. 5526, 5757.

### 2. *Disproportionate Share Hospital Adjustment*

As a rule, "[t]he Medicare program pays a hospital a fixed rate for treating each Medicare patient, based on the patient's diagnosis and regardless of the hospital's actual costs."  *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 429 (2022) (citing §§ 1395ww(d)(1)-(4)).  "The rates are designed to reflect the amounts an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis," and "[i]f the hospital spends anything more, it suffers a financial loss."  *Id.* (citing 42 C.F.R. § 412.2 (2022)).

The flat-rate payment system thus incentivizes hospitals to provide efficient levels of medical service. *Id.*

Congress, however, "recognizing complexity in healthcare," also "provided for various hospital-specific rate adjustments—including the one at issue here for treating low-income patients." *Id.* That adjustment, known as the "disproportionate share hospital" ("DSH") adjustment, "gives hospitals serving an unusually high percentage of low-income patients enhanced Medicare payments" to "reflect[] that low-income individuals are often more expensive to treat than higher income ones" and to "encourage[] hospitals to treat low-income patients." *Id.* (internal quotation marks omitted).

To calculate a DSH adjustment, "the Department of Health and Human Services (HHS) adds together two statutorily described fractions, usually called the Medicare fraction and the Medicaid fraction." *Advoc. Christ Med. Ctr. v. Kennedy* ("*Advocate Christ III*"), 605 U.S. 1, 7 (2025) (internal quotation marks omitted) (citing § 1395ww(d)(5)(F)(vi)). These two fractions are "designed to capture two different low-income populations that a hospital serves." *Id.* (internal quotation marks omitted). When the Medicare fraction is added to the Medicaid fraction, the sum of the two expressed as a percentage yields the "disproportionate patient percentage." *Id.* at 8. The resulting percentage determines whether a hospital will receive a DSH adjustment, and if so, how much. *Id.* "The higher the disproportionate-patient percentage, the more funding a hospital receives." *Id.* (internal quotation marks omitted) (citing §§ 1395ww(d)(5)(F)(vii)–(xiv)). This case concerns only the Medicare fraction, also commonly called the "SSI fraction." *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 150 (2013).

### a) The SSI Fraction

The SSI fraction "represents the proportion of a hospital's Medicare patients who have low incomes, as identified by their entitlement to supplementary security income (SSI) benefits."

*Empire Health*, 597 U.S. at 429-30.  SSI is "a subsistence allowance" offered to the country's "needy aged, blind, and disabled."  *Schweiker v. Wilson*, 450 U.S. 221, 223 (1981).  Every month, the Social Security Administration ("SSA") determines eligibility for SSI benefits, which depends on an individual's income, resources, and other relevant characteristics, *see* 42 U.S.C. § 1382(c), and may be reduced based on the availability of other earned or unearned income, as well as in-kind contributions of shelter, food, and necessities, *see id.* § 1382(a).

The SSI fraction works as follows:  "The numerator counts the number of patient days attributable to Medicare patients who are poor—i.e., those Medicare patients who are entitled to SSI benefits under subchapter XVI [of the Social Security Act]."  *Advocate Christ III*, 605 U.S. at 8 (internal quotation marks omitted).  "The denominator counts the number of patient days attributable to all Medicare patients."  *Id.* (internal quotation marks omitted).  "The [SSI] fraction effectively asks, out of all patient days *from Medicare beneficiaries*" (i.e., the denominator), "what percentage of those days came from Medicare beneficiaries who *also* received SSI benefits" (i.e., the numerator)?  *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 917 (D.C. Cir. 2013) (emphasis in original).

Calculation of the SSI fraction thus requires identifying which Medicare patients are "entitled to" SSI benefits under subchapter XVI of the Social Security Act.  *See* 42 U.S.C. § 1381, *et seq.*  HHS interprets the statutory language to refer to patients who are "entitled to receive SSI benefits during the month" in which they are hospitalized.  Medicare Program, Hospital Inpatient Prospective Payment Systems Changes and FY 2011 Rates, 75 Fed. Reg. 50,042, 50,281 (Aug. 16, 2010).  On April 29, 2025, the Supreme Court upheld HHS's interpretation.  *Advocate Christ III*, 605 U.S. at 6 ("[W]e hold that a person is entitled to [SSI]

benefits when she is eligible to receive a cash payment during the month of her hospitalization.").

CMS obtains the data to calculate the SSI fraction from SSA. *See* 42 U.S.C. § 1381a. "SSA assigns [payment status] codes to track monthly (1) whether enrollees qualified for the payment and (2) the reason why or why not." *Advoc. Christ Med. Ctr. v. Becerra ("Advocate Christ II")*, 80 F.4th 346, 350 (D.C. Cir. 2023), *aff'd sub nom. Advocate Christ III*, 605 U.S. 1. The code "N01," for instance, "indicates that an enrollee failed to receive a payment for a particular month ('N') because of excess income during that month ('01'). *Id.* In a 2010 rulemaking, HHS reviewed SSA's various codes and concluded that codes C01, M01 and M02 (assigned to automated and manual cash payments) "accurately capture[d] all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits." 75 Fed. Reg. 50,042, 50,281. HHS thus requests SSI data regarding only those three codes from SSA. Accordingly, in the file that SSA shares with HHS, SSA includes "monthly indicators" denoting whether an individual's SSI-payment status for each given month fell within codes C01, M01 or M02. *Advocate Christ II*, 80 F.4th at 350; *see also* 51 Fed. Reg. 31,454, 31,459 (Sept. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits"). Importantly, SSA does not share with HHS the underlying individual codes—for instance, N01, C01, M01, or M02— reflecting SSA's determination of why specific enrollees were or were not entitled to SSI benefits month-to-month. *Advocate Christ II*, 80 F.4th at 351.

Using the file shared by SSA containing the "monthly indicators," CMS then calculates the numerator of the SSI fraction by determining the number of individuals who appear in both the SSA's eligibility file and its own Medicare inpatient data. *Id.*; *see also Pomona Valley Hosp.*

*Med. Ctr. v. Azar*, No. 18-cv-2763, 2020 WL 5816486, at *2 (D.D.C. Sept. 30, 2020), *aff'd*, 82 F.4th 1252 (D.C. Cir. 2023).

      b)  <u>Section 951</u>

In 2003, to enable hospitals to check CMS's calculations, Congress enacted Section 951 of the Medicare Prescription Drug, Improvement, and Modernization Act ("Medicare Modernization Act"). *Advocate Christ II*, 80 F.4th at 351. Section 951 requires the Secretary to "arrange to furnish . . . hospitals . . . with the data necessary for such hospitals to compute the number of patient days used in computing the disproportionate patient percentage . . . for that hospital for the current cost reporting year." Pub. L. No. 108-173 § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. § 1395ww note).

For almost two decades, the Secretary has implemented Section 951 by providing hospitals with data of the "matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis." Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005); *see also HMH I* Am. Compl. ¶ 36 (acknowledging same); *HMH II* Compl. ¶ 37 (same). Put simply, "[t]his amounts to a list of inpatient days along with a binary yes-or-no marker indicating whether the patient for those days was counted as being entitled to SSI benefits." *Advocate Christ II*, 80 F.4th at 351. CMS compiles this list using the same method that it uses to calculate the numerator of the SSI fraction—i.e., by comparing the individuals appearing in the SSI eligibility file received from SSA against its own Medicare inpatient data. *See supra* Part I.A.2(a) (last paragraph). CMS does not share with the hospitals the SSI eligibility file that it receives from SSA, nor does CMS share SSA's underlying payment status codes, information which CMS itself does not even receive from SSA. *See Advocate Christ II*, 80 F.4th at 351.

### B.    Factual and Procedural Background

Plaintiffs in these two consolidated cases—*HMH I* and *HMH II*—consist of seven hospitals (collectively, "the Hospitals"), all but one of which are parties in both actions. Dissatisfied with the Medicare contractors' reimbursement determinations for FY 2015 and FY 2016, plaintiffs challenge CMS's calculation of their SSI fractions.  *See* Joint Appendix ("J.A.") 206 (*HMH I*) (FY 2016); J.A. 628 (*HMH II*) (FY 2015).  Presenting similar issue statements, the administrative appeals framed the question presented as "whether the correct SSI factors were used to calculate the Hospitals' . . . Medicare [DSH] payments," explaining that the Hospitals believed their DSH payments were "unlawfully low" and "want[ed] to assure that the correct SSI factors are used when calculating their DSH and capital DSH payments."  J.A. 294 (*HMH I*); *see also* J.A. 475 (*HMH II*) (similar issue statement).

After receiving notification of the Hospitals' appeals, the Board directed the Hospitals and the Medicare contractor to file preliminary position papers, warning the parties that the preliminary position paper "must state the material facts that support the appealed claim, identify the controlling authority (e.g., statutes, regulations, policy, or case law), and provide arguments applying the material facts to the controlling authorities."  *See* J.A. 204 (*HMH I*), 621 (*HMH II*).

From July 2021 to September 2022, the Hospitals and Medicare contractor exchanged preliminary position papers.  As relevant to the Board's decision in the administrative appeal giving rise to *HMH II*, the Hospitals' argument section cited only to *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008), which found that CMS's calculation of its adjustments for fiscal years 1993-1996 had failed to rely on the best available data to calculate the SSI fraction.  Relying on *Baystate*, the Hospitals argued that the SSI percentages calculated by the Medicare contractor for FY 2015 were "likely understated" because, in relevant part, "CMS improperly failed to include in the numerator several categories of patients" who should

have been counted in the SSI fraction.  J.A. 552-53 (*HMH II*).  As relief, the Hospitals asked to

(1) "have their FY 2015 DSH payments recalculated using an SSI percentage that incorporates

the latest and most accurate data available," and (2) "be given access to the information

necessary so that the Hospitals are able to validate that the SSI percentages" are "correct."  J.A.

553 (*HMH II*).

Importantly, the Hospitals' preliminary position paper in the *HMH II* administrative

appeal presented no arguments about their right to data under Section 951 of the Medicare

Modernization Act, or the proper statutory interpretation of "entitled to [SSI] benefits" under 42

U.S.C. § 1395ww(d)(5)(F)(vi)(I).  The Hospitals' preliminary briefs also contained no reference

to *Pomona Valley Hospital Medical Center v. Becerra*, 82 F.4th 1252 (D.C. Cir. 2023), a case in

which some hospitals successfully made a *prima facie* showing of erroneous DSH calculations

by using California's Medicaid data as a proxy to identify the number of SSI-entitled patients.

*See HMH II* Plaintiffs' Preliminary Position Paper, J.A. 544-54; *HMH II* Plaintiffs' Preliminary

Response, J.A. 463-67.  In comparison, the Hospitals' preliminary response in the administrative

appeal challenging reimbursement calculations for FY 2016 did discuss *Pomona Valley* and its

legal relevance to the appeal.  *See HMH I* Providers' Preliminary Response, J.A. 39-40.

In 2023, while the Hospitals' administrative appeals in *HMH I* and *HMH II* were pending

before the Board, the D.C. Circuit issued its decision in *Advocate Christ II*, 80 F.4th 346 (D.C.

Cir. 2023).  In that case, a group of hospitals challenged their SSI fractions for various time

periods, arguing that "CMS violated the Medicare statute by treating only three payment codes—

C01, M01, and M02—as indicators of SSI entitlement."  *Advocate Christ Med. Ctr. v. Azar*

*("Advocate Christ I")*, No. 17-cv-1519, 2022 WL 2064830, at *4 (D.D.C. Jun. 8, 2022).  They

"contended that CMS should read the phrase 'entitled to [SSI] benefits' in the same way that it

reads the phrase 'entitled to benefits under [Medicare] part A,' to include both paid and unpaid SSI days." *Id.* at *4 (alteration in original) (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)).  The case eventually reached the D.C. Circuit, which affirmed the Secretary's statutory interpretation that a patient is "entitled to" SSI benefits only if she receives a cash payment during the month of her hospitalization.  *Advocate Christ II*, 80 F.4th at 355.  The D.C. Circuit also denied the hospitals' mandamus request to compel CMS to share the patients' underlying SSI payment status codes for the years at issue.  *Id.*  On June 10, 2024, the Supreme Court granted certiorari to resolve what it means to be "entitled to [SSI] benefits."  *Advocate Christ III*, 605 U.S. at 10.

Just a few weeks after the Supreme Court granted cert in *Advocate Christ*, three of the Hospitals commenced *HMH I* in federal court by filing a two-count Complaint against the Secretary.  *See HMH I* Compl., ECF No. 1.  The Complaint alleged that CMS's SSI calculations were unlawful on four separate grounds: (1) the Hospitals' proxy data from the New Jersey Medicaid agency yielded different numbers, *id.* ¶¶ 71-72; (2) CMS's interpretation of "entitled to" benefits incorrectly excluded those who did not receive SSI cash payments during their inpatient stay, an issue that plaintiffs noted had just been taken up by the Supreme Court, *id.* ¶¶ 73-75 & n.3; (3) CMS supposedly applied an actual-receipt rule whereby the agency excludes days when a patient was entitled to an SSI cash payment but did not actually receive it, *id.* ¶ 76; and (4) CMS's promulgation of its interpretation of "entitled to" was procedurally deficient because it was included in the preamble to a final rule published in the Federal Register but not codified in the Code of Federal Regulations, *id.* ¶ 77.  The Complaint also alleged that mandamus relief was appropriate because CMS failed to execute its "clear duty" under Section 951 of the Medicare Modernization Act to (i) "disclose to the Hospitals the full SSI-eligibility data it possesses," and (ii) "to obtain from SSA and disclose to the Hospitals the underlying SSI

payment status codes for each SSI eligible individual included in the denominators of the

Hospitals' SSI fractions." *Id.* ¶¶ 85-90.  As relief, the Hospitals sought to set aside CMS's

calculations, to compel CMS to disclose the patient-level SSI-eligibility data, to declare CMS's

interpretation of "entitled to" SSI benefits as contrary to law, and to remand for recalculation of

their SSI fractions.  *See id.* at 31 (Request for Relief).  The Hospitals never sought EJR from the

Board and conceded in the Complaint that the Board had not rendered a final decision in the

pending administrative appeal.  *See id.* ¶ 79.

In the administrative appeal giving rise to *HMH II*, the Hospitals took a different

procedural path, filing, on August 22, 2024, their first request for EJR.  *See* J.A. 443-54 (*HMH*

*II*).  The two "questions of law" raised in the EJR request were: (1) whether, under Section 951

of the Medicare Modernization Act, "the Hospitals have a legal right to obtain patient-level SSI

eligibility data" that they needed to validate their FY 2015 SSI fractions, and (2) whether CMS's

interpretation of "entitled to [SSI] benefits," as used in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), is

lawful.  J.A. 432 (*HMH II*).  In addition to these two "questions of law," the Hospitals also raised

"a third legal issue in their EJR request . . . based on the *Pomona Valley* litigation," seeking to

use New Jersey Medicaid data as a proxy to identify the number of SSI-entitled patients.  J.A.

436 (*HMH II*).  The Medicare contractor objected to the EJR request, arguing that the Hospitals

"seek[] to include issues that were not raised in the appeal and were not raised in the preliminary

position paper."  J.A. 440 (*HMH II*).

In September 2024, the Board denied the Hospitals' EJR request on procedural grounds.

*See* J.A. 413-39 (*HMH II*).  Specifically, the Board determined that the Hospitals failed to raise

the two "questions of law" and the *Pomona Valley* issue in either their issue statement or

preliminary position paper and, as such, those issues were not properly part of the administrative

appeal.  *See* J.A. 432-33 (*HMH II*).  The Hospitals' preliminary position paper identified the

issue presented "as a *Baystate* data matching issue," and the Board found that the Hospitals

"failed to brief" arguments related to Section 951, the meaning of "entitled to" SSI benefits, and

the applicability of *Pomona Valley*.  *See* J.A. 434-35; *see also* J.A. 434 (noting that the Hospitals

in their preliminary position paper "failed to brief the merits of . . . or even cite [to] . . . § 951 and

the [Final Rule] which implemented this statutory provision"); J.A. 435 (similar, regarding the

Hospitals' challenge to the Secretary's interpretation of "entitled to [SSI] benefits" as used in 42

U.S.C. § 1395ww(d)(5)(F)(vi)(I)); J.A. 436-39 (explaining that the Hospitals failed to "reference

or discuss the *Pomona Valley* litigation or the legal theories underling it in their [preliminary

position paper]," "notwithstanding the fact that the *Pomona Valley* District Court

decision . . . predated the [Hospitals'] filing").  The Board noted that "what the Providers[]

briefed in their EJR request could have and should have been included, three (3) plus years

earlier, in their [preliminary position paper] consistent with 42 C.F.R. § 405.1853(b), Board Rule

25, and the January 20, 2021 Notice of Critical Due Dates."  J.A. 436 (*HMH II*) (emphasis

omitted).

      The following month, on October 2024, the Hospitals filed a second EJR request, framing

the "question of law" as "[w]hether CMS correctly calculated the Hospitals' FY 2015

Medicare/SSI Fractions."  J.A. 369 (*HMH II*).  The Medicare contractor objected, J.A. 360-61

(*HMH II*), and the Board, finding that factual disputes remained, denied the second request as

well, J.A. 359 (*HMH II*).

      On November 18, 2024, after being twice denied EJR by the Board, plaintiffs

commenced *HMH II* in this Court, raising effectively the same claims and seeking the same

relief for FY 2015 as they did for FY 2016 in *HMH I*.  *See HMH II* Compl. ¶¶ 89-95, 103-08 &

Request for Relief, ECF No. 1.  A few days later, plaintiffs filed an Amended Complaint in *HMH I*, naming all seven Hospitals as plaintiffs and adding some additional allegations to account for the proceedings in *HMH II*.  *See HMH I* Am. Compl., ECF No. 16.

The two HMH actions were subsequently consolidated.  *See HMH I* Minute Order (Jan. 14, 2025) (granting defendant's motion to consolidate, Mot. to Consol., No. 24-cv-1901, ECF No. 18).  Defendant then moved to dismiss the Complaints in both cases, and plaintiffs responded by filing a motion for summary judgment, to which defendant responded with a cross-motion for summary judgment, resulting in three pending dispositive motions before the Court. *See* Def.'s Mot. to Dismiss Consol. Actions ("Def.'s MTD"), ECF No. 19; Pls.' Cross-Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 22; Pls.' Mem. in Opp'n to Def.'s MTD and Supp. Pl.'s MSJ ("Pls.' Opp'n to MTD"), ECF No. 22-1; Def.'s Combined Reply Mem. Supp. MTD, Cross-Mot. for Summ. J., and Opp'n to Pl.'s MSJ ("Def.'s Reply Supp. MTD"), ECF No. 28; Pls.' Reply Supp. MSJ and Opp'n to Def.'s Cross-MSJ, ECF No. 32; and Def.'s Reply Supp. Cross-MSJ, ECF No. 34.[1]  These motions are ripe to resolve.

## II.    STANDARD OF REVIEW

"Article III of the Constitution prescribes that federal courts are courts of limited subject-matter jurisdiction and have the power to decide only those cases over which Congress grants jurisdiction."  *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020)

---

[1]        Some of the memoranda filed in support of these motions are docketed multiple times and, to simplify citation, only one of the duplicate memoranda will be cited.  For example, plaintiffs' Memorandum of Point and Authorities in Opposition to Defendant's Motion to Dismiss and in Support of Plaintiffs' Cross-Motion for Summary Judgment is docketed twice, at ECF Nos. 22 and 23, and only the memorandum at ECF No. 22 is cited. Defendant's Combined Reply Memorandum in Support of Motion to Dismiss Consolidated Actions, Memorandum of Points and Authorities in Support of Defendant's Cross-Motion for Summary Judgment, and Opposition to Plaintiffs' Motion for Summary Judgment is docketed three times, at ECF Nos. 28, 29, and 30, and only the memorandum at ECF No. 28 is cited.  Plaintiffs' Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment is docketed twice, at ECF Nos. 32 and 33, and only the memorandum at ECF No. 32 is cited.

(internal quotation marks and alterations omitted). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction over the claim at issue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). When considering a Rule 12(b)(1) motion to dismiss, a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 281 (D.C. Cir. 2022) (internal quotation marks and alterations omitted). Dismissal is required if a court lacks subject matter jurisdiction. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (internal quotation marks omitted). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully.").

## III.    DISCUSSION

For the reasons discussed below, the Board has not rendered a final decision in either *HMH I* or *HMH II*, the futility doctrine does not excuse plaintiffs' failure to exhaust, and plaintiffs have not demonstrated entitlement to mandamus relief. Accordingly, defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim for

mandamus relief is granted, and the parties' respective motions for summary judgment are each denied as moot.

### A.    The Court Lacks Jurisdiction Under the Medicare Statute

#### 1.    *The Board Has Not Rendered a Final Decision*

Recall that the Medicare statute generally limits judicial review to "final decision[s] of the Board" or "of any reversal, affirmance, or modification [thereof] by the Secretary [via the CMS Administrator]."  42 U.S.C.§ 1395*oo*(f)(1); *see also* 42 U.S.C. § 405(g) (providing for judicial review "after any final decision . . . made after a hearing to which [the individual seeking judicial review] was a party").  Plaintiffs have not satisfied the final decision requirement because they have not received a final decision of the Board or the CMS Administrator on any of their claims.

With respect to *HMH I*, plaintiffs concede that *no* decision, much less a "final decision," has been issued by the Board in their administrative appeal. *See HMH I* Am. Compl. ¶ 89 (admitting that "[t]he Hospitals' appeals pressing their objections to CMS's calculation of the FY 2016 SSI fractions remain pending before the [Board]," and that "[i]n seeking judicial review while their [Board] appeals are still pending, the Hospitals arguably have not exhausted the administrative review process set forth in 42 U.S.C. § 1395*oo*(f)(1)").

With respect to *HMH II*, plaintiffs contend that the Board rendered "final decisions" when the Board denied plaintiffs' two requests for EJR.  Pls.' Opp'n to MTD at 23-25.  Plaintiffs assert that "[t]he plain text of the statute . . . provides that *any* disposition of an EJR request is a reviewable final decision, without reference to the content of that disposition." *Id.* at 23 (emphasis in original).  In contrast, defendant argues that while a Board's *grant* of EJR constitutes a "final decision" within the meaning of 42 U.S.C. § 1395*oo*(f)(1), a Board's *denial* of EJR does not.  *See* Def.'s MTD at 27.

Defendant has the better reading of the statute.  The plain text of Section 1395*oo*(f)(1) reads, in relevant part, as follows:

> Providers shall have the right to obtain judicial review of any final decision of the Board . . . . *Providers shall also have the right to obtain judicial review of any action* of the [Medicare contractors] *which involves a question of law or regulations* relevant to the matters in controversy *whenever the Board determines* (on its own motion or at the request of a provider of services as described in the following sentence) *that it is without authority to decide the question,* by a civil action commenced within sixty days of the date on which notification of *such determination* is received.  If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy  . . . . *The Board shall render such determination in writing* within thirty days after the Board receives the request and such accompanying documents and materials, *and the determination shall be considered a final decision* and not subject to review by the Secretary . . . .

42 U.S.C. § 1395*oo*(f)(1).

Plaintiffs cherry-pick excerpts of Section 1395*oo*(f)(1), asserting that this paragraph "provides hospitals 'the right to obtain judicial review of *any* final decision of the Board,'" and that "when a hospital files a 'request for a determination by the Board of its authority to decide [a] question of law or regulations relevant to the matters in controversy'—that is, an EJR request—the 'Board shall render such determination in writing . . . and the determination *shall be considered a final decision*.'"  Pls.' Opp'n to MTD at 23 (alteration and emphases in original) (quoting 42 U.S.C. § 1395*oo*(f)(1)).  Thus, in plaintiffs' view, this statutory provision "provides judicial review over '*any* final decision' of the [Board], . . . *without* any caveat about whether the determination was affirmative or negative."  *Id*. at 23-24 (emphases in original).

Plaintiffs' interpretation, however, reads Section 1395*oo*(f)(1) out of context.  "Courts have a duty to construe statutes, not isolated provisions."  *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks omitted); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("[S]tatutes can be sensibly understood only by reviewing text in context" (internal quotation marks omitted)).

Read in context, Section 1395*oo*(f)(1) provides "the right to obtain judicial review of any action of the [Medicare contractors] which involves a question of law or regulations relevant to the matters in controversy," also known as an EJR request, but only "whenever the Board determines . . . *that it is without authority to decide the question*."  42 U.S.C. § 1395*oo*(f)(1) (emphasis added).  Only upon "notification of such determination" may a provider "commence[]" a civil action "within sixty days."  *Id.*  In the "following sentence," Section 1395*oo*(f)(1) then explains how "a provider of services" may "request" such a determination.  *Id.*

Consistent with the statutory text, for nearly half a century, defendant has interpreted Section 1395*oo*(f)(1) as providing judicial review only for grants of expedited review.  *See* Medicare Program; Provider Reimbursement Review Board: Expedited Administrative Review, 47 Fed. Reg. 31,686, 31,688 (Jul. 22, 1982) ("[T]here is no provision in the law for judicial review of a Board determination not to grant expedited review.").  As another Judge on this Court reasoned in interpreting this same statute, "by stating unequivocally that judicial review shall be available 'whenever' the [Board] determines that it lacks the authority to decide a question of law, the provision indicates that Congress intended for providers to have access to judicial review any time that the [Board] makes a *no authority determination*, so long as the provider timely commences a civil proceeding."  *Affinity Healthcare Servs., Inc. v. Sebelius*, 746 F. Supp. 2d 106, 115 (D.D.C. 2010) (emphasis added).  "[W]here, as here, the [agency's] interpretation is consistent with the statute's plain meaning, such prior consistent agency interpretation is 'especially useful in determining the statute's meaning.'"  *Norwich Pharms., Inc. v. Kennedy*, No. 25-cv-91 (BAH), 2025 WL 1148463, at *17 (D.D.C. Apr. 18, 2025) (quoting *Loper Bright*, 603 U.S. at 394), *appeal docketed*, No. 25-5137 (D.C. Cir. Apr. 23, 2025).

Defendant's interpretation is not only the best reading of Section 1395*oo*(f)(1), it is also the one best supported by the legislative history.  *See, e.g.*, *Global Health Council v. Trump*, Nos. 25-5097 and 25-5098, 2025 WL 2480618, at *9 (D.C. Cir. 2025) ("Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from . . . [*inter alia*] . . . its legislative history . . . .") (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984))).  The House Report accompanying the enactment of Section 1395*oo*(f)(1) makes clear that providers may obtain EJR only where the Board determines that it lacks the authority to decide the question presented:

> Title VIII authorizes the Provider Reimbursement Review Board to determine, on its own motion or at the request of a provider of services, whether it has jurisdiction over an issue brought before it by the provider.  *On the basis of a determination by the Board that it is without authority to decide the question* (or if the Board fails to render such a determination within 30 days of the provider's request), *the provider will be permitted to commence a civil action* with respect to the matters in controversy without further administrative review.

> Under present law, a provider's dissatisfaction with a particular determination made by its fiscal intermediary on the basis of a regulation issued by the Secretary must first be brought to the Board, even though the Board may not have the authority to reverse or overrule the regulation.  (The Board has no authority, for example, to rule on the legality of the Secretary's regulations but it must, nonetheless, conduct a full review of the challenge.)  The effect of this process has been to delay the resolution of controversies for extended periods of time and to require providers to pursue a time-consuming and irrelevant administrative review merely to have the right to bring suit in a U.S. district court.  *Title VIII addresses this problem by giving Medicare providers the right to obtain immediate judicial review in instances where the Board determines that i[t] lacks jurisdiction to grant the relief sought.*

H.R. Rep. No. 96-1167, at 394 (1980), 1980 U.S.C.C.A.N. 5526, 5757 (emphasis added); *see also Affinity Healthcare*, 746 F. Supp. 2d at 115-16 (discussing same legislative history).

As the House Report makes clear, EJR was contemplated only in instances where the Board determines "that it is without authority to decide the question."  H.R. Rep. No. 96-1167, at 394 (1980).  Notably, while Congress determined that permitting EJR when the Board itself saw further administrative proceedings as pointless would reduce the "problem" of "delay[s]," *id.*,

this was not the conclusion when the Board made any other determination.  Congress' policy

judgment is not unsensible: If Congress believed that the Board is typically correct in assessing

its own authority, then permitting judicial review whenever a Board denies EJR would, on net,

only prolong the administrative review process rather than reduce delays.  *See* 42 C.F.R.

§ 405.1842(h)(2)(i) (providing that if hospitals file a lawsuit seeking judicial review "for a period

that is covered by the Board's decision denying EJR, the Board may not conduct any further

proceedings . . . on the legal question or the matter at issue before the lawsuit is finally

resolved").  Thus, "to the extent legislative history may shed light on otherwise clear text, the

history of the [disputed statute] does so by undercutting [plaintiffs'] position."  *See Norwich*

*Pharms.*, 2025 WL 1148463, at *14.

   Further, the theory plaintiffs propose makes little sense in practice.  The case law reveals

that the Board often denies EJR when other issues must be resolved first, like jurisdictional or

factual questions that precede a determination on the merits.  *See, e.g.*, *Aria Health v. Becerra*,

No. 22-cv-2272, 2024 WL 1344405, at *3 (D.D.C. Mar. 29, 2024) (describing plaintiffs' EJR

request as "premature because the Board had not yet reopened [certain] remanded claims or

completed its jurisdictional review"); *Abington Mem'l Hosp. v. Bowen*, No. 86-cv-7262,

1988 WL 71367, at *2 (E.D. Pa. Jul. 1, 1988) (finding no subject matter jurisdiction because the

Board "ha[d] yet to determine whether it possesse[d] jurisdiction . . . over any of the plaintiffs'

requests"); *Mercy Gen. Hosp. v. Becerra*, 643 F. Supp.3d 16, 31 (D.D.C. 2022) (explaining that

plaintiffs should "await the Board's determination as to whether the challenged regulation [was]

relevant to the matter at issue" before seeking EJR).  Indeed, in some cases, the Board may deny

EJR initially but revisit the possibility later when the issues originally preventing expedited

review have been resolved.  *See, e.g.*, *Abington Mem'l Hosp.*, 1988 WL 71367, at *4 (holding—

in a case where EJR was denied because the Board had not yet determined whether it possessed jurisdiction—that plaintiffs' suit was premature, and agreeing with the defendants' "suggestion" to remand the case and have the Board reassess the EJR request after deciding the jurisdictional issue).  Put in administrative law terms, the Board frequently denies EJR when its "decisionmaking process" is not yet "consummat[ed]," thus rendering judicial review of EJR denials in many situations impracticable.  *Bennett v. Spear*, 520 U.S. 154, 156 (1997); s*ee* J.A. 359 (*HMH II*) (rejecting plaintiffs' second EJR request because factual disputes remained that the Board had not yet resolved).

Unsurprisingly then, courts—including the Supreme Court in *dicta*—have repeatedly interpreted Section 1395*oo*(f)(1) as permitting judicial review by an Article III court only upon a Board's *grant* of EJR.  *See, e.g.*, *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 406-07 (1988) (stating, in *dicta*, that "[s]ubsection (f)(1) grants providers the right to obtain judicial review of an action of the [Medicare contractor], but the predicate is that the Board must first make a determination that it is without authority to decide the matter because the provider's claim involves a question of law or regulations"); *Mercy Gen. Hosp.*, 643 F. Supp. 3d at 29 ("The plain reading of the statute indicates that 'Congress intended for providers to have access to judicial review any time that the [Board] makes a no authority determination . . . .'"); *Affinity Healthcare*, 746 F. Supp. 2d at 116 ("Congress intended for providers to have an avenue for obtaining immediate judicial review, without additional administrative proceedings, whenever the [Board] makes a no authority determination.").  The D.C. Circuit has also held that a district court cannot review whether a Board's EJR determination is correct—a holding that sensibly requires district courts to address the merits of a claimant's challenge whenever the Board grants EJR, but which would make little sense if also applied to denials of EJR.  *See Allina Health*

*Servs. v. Price*, 863 F.3d 937, 941 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ("[A] district court may not review the Board's no-authority determination at HHS's request. . . . The statute conditions expedited judicial review in the district court on the existence of that no-authority determination, *not* on whether that determination is correct." (emphasis in original)).

Finally, dismissal has been found to be appropriate by at least two other Judges on this Court after concluding that EJR denials cannot support a request for judicial review.  *Mercy Gen. Hosp.*, 643 F. Supp. 3d at 30 ("[T]he denial of expedited judicial review . . . [is] not a 'final decision' based on either the meaning of the statute or applicable regulatory provisions," but instead "is best categorized . . . as an 'interlocutory' decision."); *Lester E. Cox Med. Centers v. Sebelius*, 691 F. Supp. 2d 162, 169-70 (D.D.C. 2010) (discussing regulations from 2007, which are similar to those applicable here, and reasoning that "[Board] Instructions and regulations do not allow for immediate judicial review where EJR is denied" because only "the Board's decision to *grant* EJR is a final, reviewable decision" (emphasis in original)).  Tellingly, plaintiffs have not cited to a single case in which a court exercised jurisdiction upon the Board's denial of EJR.  *See* Pls.' Opp'n to MTD at 23-24 (citing *Affinity Healthcare Services* and *Allina Health Services*, in which the Board granted expedited review; *Mercy General Hospital*, in which the Board denied expedited review and the court held that no "final decision" had been rendered; and *Edgewater Hospital, Inc. v. Bowen*, 857 F.2d 1123 (7th Cir. 1988), which did not involve an EJR request).  Simply put, plaintiffs have not received "final decisions" from the Board in either *HMH I* or *HMH II*.

### 2.    *The Futility Doctrine Does Not Excuse Plaintiffs' Failure to Exhaust*

Alternatively, plaintiffs argue that even if the Board has not issued final decisions on their EJR requests, they should be excused from Section 405(g)'s exhaustion requirement

because "further administrative review would be futile."  Pls.' Opp'n to MTD at 25.  With

respect to *HMH I*, for which plaintiffs concede they "did not seek EJR," plaintiffs claim that

filing such a request would be futile because "there is no reason to expect that the [Board] would

have approached any such request differently than [how] it reacted" to the EJR requests in *HMH

II*—that is, to deny the request.  *Id.* at 28-29.  Plaintiffs further argue that for both *HMH I* and

*HMH II*, "it would be pointless for the Hospitals to pursue further [Board] proceedings," because

CMS "refuses to share with the Hospitals the patient-level SSI-eligibility data that is 'necessary'

for them to compute their SSI fractions for the years at issue."  *Id.* at 30.  Neither argument is

persuasive.

>   a)  Futility Does Not Excuse Plaintiffs' Failure to Request EJR in *HMH I*

Under general administrative exhaustion principles, establishing futility is an

"extraordinarily high hurdle."  *Suarez v. Colvin*, 140 F. Supp. 3d 94, 101 (D.D.C. 2015).  A

showing of futility requires "certainty of an adverse decision or indications that pursuit of

administrative remedies would be clearly useless."  *UDC Chairs Chapter, Am. Ass'n of Univ.

Professors v. Bd. of Trs. of the Univ. of DC*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (internal

quotation marks omitted).  Mere suppositions that an adverse decision would be "*highly

likely* . . . does not satisfy [the D.C. Circuit's] strict futility standard requiring a *certainty* of an

adverse decision."  *Comm'ns Workers of Am. v. AT&T Co.*, 40 F.3d 426, 433 (D.C. Cir. 1994)

(emphases in original).

Plaintiffs assert that the Board would have inevitably denied EJR in *HMH I*, just as it did

in *HMH II*.  *See* Pls.' Opp'n to MTD at 28-29.  What plaintiff views as a foregone conclusion,

however, seems far from "certain[]."  *See Comm'ns Workers of Am.*, 40 F.3d at 433 (emphasis

omitted).  Plaintiffs' preliminary position papers in *HMH I* contained substantive differences

from those in *HMH II*.  *Compare HMH I* Plaintiffs' Preliminary Response, J.A. 39-40

(discussing the *Pomona Valley* litigation and how the D.C. Circuit's opinion in that case would, once issued, "be relevant to the future proceedings in this group appeal") *with HMH II* Plaintiffs' Preliminary Position Paper, J.A. 544-54, *and HMH II* Plaintiffs' Preliminary Response, J.A. 463-67 (containing no mention of *Pomona Valley*).  Plaintiff does not appear to dispute defendant's contention that these differences exist between the briefs submitted in *HMH I* and *HMH II*—differences that may have altered the Board's analysis in *HMH I* had EJR been requested.  *See* Board's *HMH II* Expedited Review Decision, J.A. 437 (dismissing plaintiffs' belated *Pomona Valley* argument in the *HMH II* appeal because plaintiffs "d[id] not reference or discuss the *Pomona Valley* litigation or the legal theories underlying it" in their preliminary briefing); Def.'s MTD at 20-21 (pointing out that in *HMH II*, "the Hospitals had failed to properly brief the *Pomona Valley* issue in their preliminary position paper," whereas in *HMH I*, the "preliminary response submitted by Hospitals . . . discuss[ed] . . . *Pomona Valley* and assert[ed] that the D.C. Circuit's opinion resolving the Secretary's appeal in that case would, once issued, 'be relevant to the future proceedings in this group appeal'").

Further, precedent overwhelmingly counsels against granting a waiver of the exhaustion requirement where, as here, a mechanism exists to seek EJR that plaintiffs never pursued.  In *Ryan v. Bentsen*, for example, a plaintiff filed suit challenging the termination of his Social Security retirement benefits without first resorting to the agency's expedited appeal process, which is similar to the EJR mechanism at issue here but provided by the agency rather than Congress.  *See* 12 F.3d 245, 246, 248 (D.C. Cir. 1993) (applying 42 U.S.C. §§ 405(g), 20 C.F.R. §§ 404.923-404.924).  The D.C. Circuit in *Ryan* affirmed the district court's dismissal for failure to exhaust administrative remedies, holding that "resort to the [expedited appeal process] would not have been futile."  *Id.* at 248.  As the Court explained, the expedited appeal process "benefits

both the parties and the court" by "allow[ing] the claimant to circumvent full [agency] review,"
while at the same time ensuring that "the parties come to court in agreement as to the facts and
the applicable law." *Id.* "This means that when the case reaches the district court there will be
no question regarding exhaustion of remedies or applicability of the futility doctrine"—"only the
statute's [legality] remains in dispute." *Id.*; *see also Tarzana Providence Health Sys. v. Becerra*,
749 F. Supp. 3d 1, 6-7 (D.D.C. 2024) (declining to waive exhaustion where hospitals, bringing
similar SSI fraction-related claims as plaintiffs in this case, filed suit before the Board ruled on
their pending request for EJR under § 1395*oo*(f)(1)); *Nat'l Ass'n for Home Care & Hospice v.
Becerra*, 731 F. Supp. 3d 78, 92 (D.D.C. 2024) (holding that an association of home healthcare
agencies "failed to exhaust its administrative remedies because it skipped the agency's process
for seeking expedited judicial review").

     Moreover, even assuming the Board would have denied an EJR request in *HMH I* had
one been submitted, plaintiffs face yet another hurdle in their futility argument: A denial of EJR
is not a "final decision" within the meaning of 42 U.S.C. § 1395*oo*(f)(1). *See supra* III.A.1.
Plaintiffs thus would also need to demonstrate, as with *HMH II*, that pursuing further board
proceedings after a denial of EJR would be futile. As discussed next, plaintiffs have not
established that further Board proceedings would be futile.

        b)  Futility Does Not Excuse Plaintiffs' Failure to Pursue Further Board
             Proceedings in *HMH I* and *HMH II*

     In *HMH II*, the Board denied plaintiffs' first EJR request on procedural grounds, finding
that plaintiffs failed to preserve the three issues raised in their EJR request: (1) whether hospitals
have a legal right to obtain SSI eligibility data maintained by SSA; (2) whether CMS's
interpretation of the phrase "entitled to [SSI] benefits" under subchapter XVI of the Social
Security Act is substantively and procedurally invalid; and (3) whether, under *Pomona Valley*,

plaintiffs can make a prima facie showing that CMS materially undercounted the numerators of plaintiffs' SSI fractions. *See* J.A. 432-39 (*HMH II*) (finding that none of the questions raised in the EJR request were stated in the Hospitals' group appeal request or briefed in the Hospitals' preliminary position paper, even though those questions "could have and should have been included, three (3) plus years earlier, in their [preliminary position paper] consistent with 42 C.F.R. § 405.1853(b)" and other rules (emphasis omitted)). In plaintiffs' view, the Board's "insistence that numerous legal questions underlying the Hospitals' challenge to CMS's calculation of their SSI fractions are excluded from the scope of the Hospitals' appeal amply demonstrates that further [Board] proceedings would be futile." Pls.' Opp'n to MTD at 25.

To support its request for waiver of Section 405(g)'s exhaustion requirement, plaintiffs rely heavily on *Tataranowicz v. Sullivan*, 959 F.2d 268 (D.C. Cir. 1992), invoking that case's four-element test for futility-based exhaustion under Section 405(g). *See* Pls.' Opp'n to MTD 13, 25-27, 30-32 (citing and discussing *Tataranowicz*). Decided by the D.C. Circuit more than three decades ago, *Tataranowicz* involved a class action suit brought by skilled nursing facility residents whose Medicare coverage claims had been denied based on the Secretary's interpretation of a single statutory provision. 959 F.2d at 269, 271. Plaintiffs there failed to exhaust administrative remedies, but the Court excused plaintiffs' failure on futility grounds. *Id.* at 274. At the time, the statute providing for judicial review after administrative exhaustion did not include a mechanism for seeking expedited judicial review. *See* 42 U.S.C. § 1395ff(b)(1) (1990) (providing for "judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title"); Medicare Modernization Act, Pub. L. No. 108-173, § 932(a)(1)(B), 117 Stat. at 2399 (2003) (amending 42 U.S.C. § 1395ff(b) to create a route for expedited judicial review). The Court thus reasoned that requiring exhaustion in that instance

would be "wholly formalistic" because the case involved only statutory interpretation, the Secretary gave no reason to believe the interpretation would be changed, and the next and final level of agency review was in essence review by the Secretary.  *Id.*

For several reasons, *Tataranowicz* does not control here.  First, the Supreme Court's subsequent decision in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000), calls into question whether the Medicare statute even permits waiver of exhaustion on futility grounds.  There, the Court rejected the attempt of an association of nursing homes to challenge certain Medicare regulations in federal court without first following "the special Medicare review route," as "set forth in a complex set of statutory provisions."  *Id.* at 7-8.  The Court held that the judicial review bar of Section 405 "reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies'—doctrines that in any event normally require channeling a legal challenge through the agency"—by "prevent[ing] application of the 'ripeness' and 'exhaustion' exceptions."  *Id.* at 12-13 (internal citations omitted).  This strict requirement that "virtually all legal attacks [be brought] through the agency," the Court explained, "assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying 'ripeness' and 'exhaustion' exceptions case by case."  *Id.* at 13.  While "this assurance comes at a price, namely, occasional individual, delay-related hardship," the Court recognized Congress' policy judgment that "paying this price may seem justified" when viewed "[i]n the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts."  *Id.*

28

Accordingly, the Supreme Court's reasoning in *Illinois Council* has cast significant doubt on whether *Tataranowicz* remains good law. *See Alameda Cnty. Med. Ctr. v. Becerra*, No. 23-cv-690, 2024 WL 3536620, at *5 (D.D.C. Jun. 24, 2024) ("The court is skeptical of *Tataranowicz's* continued vitality after *Illinois Council*."); *Nat'l Home Infusion Ass'n v. Becerra*, No. 19-cv-393, 2021 WL 2439570, at *7 (D.D.C. June 15, 2021) (explaining that "*Tataranowicz* predate[d] the expansive reading of § 405(g)'s channeling requirements the Supreme Court articulated in *Illinois Council*"); *cf. Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*, 62 F. Supp. 3d 114, 124 (D.D.C. 2014) (citing to *Tataranowicz*, but finding exhaustion not futile in part on the ground that "'delay-related hardship' was the price to be paid for the agency review required by Congress" (citing *Illinois Council*, 529 U.S. at 13)). *But see, e.g.*, *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 7-8 (D.D.C. 2019) (applying *Tataranowicz* to find exhaustion futile in statutory-authority challenge). Given the Supreme Court's suggestion that Congress foreclosed application of exhaustion exceptions not otherwise provided for in Medicare's complex statutory scheme, *see Illinois Council*, 529 U.S. at 13, the skepticism over *Tataranowicz's* current relevance is well-founded.

Second, in any event, *Tataranowicz* is factually distinguishable from this case, given that the statute at issue there providing for judicial review after exhaustion of administrative remedies did not establish a mechanism for seeking expedited judicial review. Thus, absent any direction from Congress, the court applied general administrative-law principles of futility. In contrast, Congress here *did* supply a path to expedited judicial review where further administrative proceedings would be futile—specifically, in instances "involv[ing] a question of law or regulations relevant to the matters in controversy" where "the Board determines . . . that it is without authority to decide the question." 42 U.S.C. § 1395*oo*(f)(1); *see Nat'l Home Infusion*

*Ass'n*, 2021 WL 2439570, at *7 (rejecting providers' reliance on *Tataranowicz* as justification for their failure to utilize the EJR process because *Tataranowicz* "did not consider the effect of the availability of expedited review in its exhaustion analysis").  As the D.C. Circuit explained in *Ryan*, the expedited review process ensures that "the parties come to court in agreement as to the facts and the applicable law," thus "isolat[ing] for thorough analysis" the legal validity of the challenged regulation and relieving the Court from "expending judicial effort on the applicability of the futility doctrine."  12 F.3d at 248-49.  Contrary to plaintiffs' contentions that *Ryan* can be distinguished because plaintiffs there never sought EJR, *see* Pls.' Opp'n to MTD at 28, the reasoning undergirding *Ryan* applies even in instances where a claimant sought EJR but was denied.  EJR is designed to "isolate for thorough analysis" the legal validity of the challenged regulation, but when EJR is denied, the parties rarely "come to court in agreement as to the facts and the applicable law."  *Ryan*, 12 F.3d at 249.  Indeed, the procedural morass of plaintiffs' two suits—triggering multiple threshold questions related to exhaustion and issue preservation before the merits may be reached—demonstrates precisely why Congress authorized EJR only when the parties agree on the question of law that a federal court should decide.

Third, any resemblance this case may have had to *Tataranowicz* has been greatly reduced by the Supreme Court's holding in *Advocate Christ*, decided after plaintiffs filed the instant suits.  In *Tataranowicz*, the Court held that requiring exhaustion would be "wholly formalistic" because the only question at issue was a purely legal one involving statutory interpretation.  959 F.2d 274.  Here, plaintiffs' principal statutory-interpretation question concerns whether CMS undercounted the number of SSI-eligible patients by interpreting a patient to be "entitled to" SSI benefits under 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) only upon receipt of a cash payment during the month of their hospitalization.  *See* Pls.' Opp'n to MTD at 36-39; *see also id.* at 7

(challenging "the agency's narrow interpretation of the statutory phrase 'entitled to [SSI] benefits,' which encompasses 'only patients receiving cash payments during the month' of their hospitalization," and advising this Court that "while the D.C. Circuit upheld CMS's interpretation," "the Supreme Court is reviewing that question in *Advocate Christ*" (alteration in original)).  In April 2025, the Supreme Court upheld the Secretary's interpretation.  *See Advocate Christ III*, 605 U.S. 1.  As plaintiffs subsequently conceded, *Advocate Christ III* foreclosed this statutory-interpretation challenge.  *See* Pls.' Reply Supp. MSJ and Opp'n to Def.'s Cross-MSJ, at 14.

Fourth, plaintiffs' remaining arguments raising discovery-related theories of futility are also foreclosed by binding precedent.  Plaintiffs contend "it would be pointless" to pursue further administrative proceedings because CMS's "cramped interpretation of its data disclosure obligations under Section 951" deprives them of the data needed to prosecute their administrative appeal, Pls.' Opp'n to MTD at 30; and because the regulations governing Board appeals "bar discovery from the Secretary, CMS, or SSA," *id.*  Plaintiffs further protest that the Board "eliminated the possibility of hearing the only conceivable facts it could hear that would bear on the substance of the Hospitals' challenge" by denying—on preservation grounds— plaintiffs' request to present SSI data plaintiffs obtained from the New Jersey Medicaid agency as an alternative source of information about the number of SSI-entitled patient days.  *Id.*  None of plaintiffs' arguments hold water.

Even assuming the futility exception survives under the current Medicare statute, application of *Illinois Council* would still bar plaintiffs' claim of futility based on lack of data.  In *Illinois Council*, the plaintiffs complained that "a host of procedural regulations unlawfully limit[ed] the extent to which the agency itself will provide the administrative review channel

leading to judicial review," because some of the regulations outright prohibited administrative appeals of specific issues.  529 U.S. at 23.  The Supreme Court held, nevertheless, that the plaintiffs could not be excused from their failure to exhaust, noting that the plaintiffs "remain[ed] free . . . to contest in court the lawfulness of any regulation or statute" after "following the special review route that the statutes prescribe."  *Id.*  Whatever complaints a claimant may have with the administrative process, the Court reasoned, "a court reviewing an agency determination under § 405(g) [will] ha[ve] adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide, including, where necessary, the authority to develop an evidentiary record."  *Id.* (internal citations omitted).

Here, plaintiffs have presented no convincing counterargument as to why its discovery-related disputes are not controlled by the holding in *Illinois Council*.  Plaintiffs attempt to distinguish *Illinois Council* as a case concerning whether providers must present their claims to the agency in the first instance, whereas this case concerns whether plaintiffs—having presented their claims to the agency—must exhaust the administrative process.  *See* Pls.' Opp'n to MTD at 29-30.  They fail, however, to explain why this distinction makes a difference.  At bottom, plaintiffs here argue that being unable to rely on their preferred dataset would make their claims harder to present "meaningfully," Pls.' Opp'n to MTD at 35, but plaintiffs in *Illinois Council* had argued that the governing regulations prevented them from raising their claims *at all*, *see* 529 U.S. at 23.  If plaintiffs in *Illinois Council* were nonetheless still required to pursue their administrative remedies before seeking judicial review, then plaintiffs here must as well.[2]

---

[2]    Because *Illinois Council* squarely applies to require exhaustion in this case, defendant's alternative argument that plaintiffs' futility argument also fails under *Pomona Valley Hospital Medical Center v. Becerra*, 82 F.4th 1252 (D.C. Cir. 2023), need not be reached.  *See* Def.'s Mem. Supp. MTD at 33; Def.'s Reply at 15.

### B.       Plaintiff is Not Entitled to Mandamus Relief

Plaintiffs also invoke the Court's jurisdiction under the Mandamus Act, 28 U.S.C.

§ 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in

the nature of mandamus to compel an officer or employee of the United States or any agency

thereof to perform a duty owed to the plaintiff."  Although the Medicare Act does not bar

mandamus jurisdiction, "the remedy of mandamus is a drastic one, to be invoked only in

extraordinary situations."  *Row 1*, 92 F.4th at 1149 (quoting *Kerr v. U.S. Dist. Ct. for N. Dist. of

Cal.*, 426 U.S. 394, 402 (1976)).  To establish mandamus jurisdiction, a plaintiff must meet three

jurisdictional requirements: A plaintiff "must demonstrate (1) a clear and indisputable right to

relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no

adequate alternative remedy exists."  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir.

2016).  The "clear right to relief" and "clear duty to act" jurisdictional elements are often

analyzed "concurrently."  *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020).  "Even when

the legal requirements for mandamus jurisdiction have been satisfied, however, a court may

grant relief only when it finds compelling equitable grounds."  *Id.* (quoting *In re Medicare

Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)).

Mandamus relief is unavailable in this case because plaintiffs have not demonstrated a

clear right to relief or the violation of a clear duty to act.  The parties dispute the proper statutory

construction of Section 951, which requires defendant to "arrange to furnish . . . hospitals . . .

[with] the data necessary for such hospitals to compute the number of patient days used in

computing the disproportionate patient percentage . . . for that hospital for the current cost

reporting year."  Pub. L. No. 108-173 § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C.

§ 1395ww note).  For almost two decades, defendant has implemented Section 951 by providing

hospitals with "a list of inpatient days along with a binary yes-or-no marker indicating whether

the patient for those days was counted as being entitled to SSI benefits." *Advocate Christ II*, 80 F.4th at 351.

Plaintiffs, instead, interpret Section 951 to impose broader disclosure requirements and seek a court order compelling CMS to take two actions: (1) "disclose to the Hospitals patient-level SSI-eligibility data obtained from SSA"; and (2) "obtain from SSA the complete SSI-eligibility data for all of the patients included in the Hospitals' SSI fractions, and to disclose the data thus received from SSA to the Hospitals." *HMH I* Am. Compl. at 36 (Req. for Relief ¶ 2), ECF. No. 16; *HMH II* Compl. at 39 (Req. for Relief ¶ 2), ECF No. 1.

The D.C. Circuit's holding in *Advocate Christ II* requires rejection of plaintiffs' mandamus claim. *See* 80 F.4th 346.  In that recently decided case, the hospitals also brought a mandamus claim "seeking an order compelling [CMS] to provide them with the payment codes assigned by SSA to their respective patients" in order "to verify or challenge CMS's calculation of their respective Medicare fractions." *Id.* at 103.  Finding mandamus relief inappropriate, the Court concluded that Section 951 does not "unambiguously compel release" of the underlying payment codes requested by the plaintiffs in that case.  80 F.4th at 355.  The Court reasoned that although the plaintiffs believed "[S]ection 951 requires HHS to disclose what they describe as 'input data' to help them re-do the entire determination of the Medicare and Medicaid fractions from start to finish," the agency's current interpretation was also possible—"Section 951 could simply mean that HHS must provide wholesale data that it uses for the actual computation." *Id.* Though "tempted to say that this ambiguity alone is enough to doom the claim, for mandamus is unavailable when the alleged duty depends on a statutory construction that is not free from doubt," *id.* (internal quotation marks omitted)*,* the Court ultimately based its decision on a "simpler ground": "What section 951 cannot mean is that HHS must give hospitals data that it

never received from SSA in the first place.  And SSA does *not* provide HHS with the specific codes assigned to individual patients," *id.* (emphasis in original).

Despite defendant's significant reliance on *Advocate Christ II* to support dismissal of plaintiffs' mandamus claims, *see* Def.'s Mem. Supp. MTD at 36, ECF No. 19-1 (citing *Advocate Christ II* multiple times), plaintiffs' briefing offers no response, *see* Pls.' Opp'n to MTD at 41-45.  Plaintiffs' Complaints, however, appear to concede that the D.C. Circuit in *Advocate Christ II* already considered and rejected a "similar claim" with respect to their second mandamus request—i.e., to compel CMS to share "the complete SSI-eligibility data for all of the patients included in the Hospitals' SSI fractions."  *See HMH I* Am. Compl. ¶ 98 n.4; *HMH II* Compl. ¶ 106 n.4; *HMH I* Am. Compl. at 36; *HMH II* Compl. at 39.  Although plaintiffs assert that they still wish to "preserve the argument" that *Advocate Christ II* was wrongly decided, *id,* "this Court is bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court," *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005).

As to plaintiffs' first request to compel CMS to "disclose to the Hospitals patient-level SSI-eligibility data obtained from SSA," *HMH I* Am. Compl. at 36; *HMH II* Compl. at 39, the D.C. Circuit's conclusion in *Advocate Christ II* that Section 951 does not "unambiguously compel release" of data beyond that already disclosed by CMS also counsels against exercising mandamus jurisdiction.  *See* 80 F.4th at 355.  Mandamus is "chief[ly]" employed to compel the performance of a "ministerial duty," *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930), and is "unavailable when the alleged duty depends on a statutory construction that is not free from doubt," *Advocate Christ II*, 80 F.4th at 355 (internal quotation marks omitted).  In reviewing a mandamus claim, "the court must interpret the statute" and assess whether the statute, "once

interpreted," "impose[s] a clear and indisputable duty" for the officer to act. *Lovitky*, 949 F.3d at 760.

Here, Section 951 imposes no clear duty in directing the Secretary to provide the data "necessary" for hospitals to compute the number of patient days that are factored into the disproportionate-share percentage, when the data qualifying as "necessary" for the hospitals is subject to interpretation. *See Advocate Christ II*, 80 F.4th at 355. In a 2005 rulemaking, when CMS decided on its current approach to disclosure, CMS had considered several commenters' proposals to "release the data file of SSI eligibility information provided to CMS by SSA" to allow hospitals "to compute their own Medicare [disproportionate share hospital] adjustment." 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005). CMS rejected those proposals, however, explaining that while it understood the commenters' concerns, "SSA is prohibited from disclosing this information by Federal law and regulations" and CMS, bound by its data use agreement with SSA, was similarly "strictly prohibited from disclosing SSI eligibility information." *Id.* Given Section 951's silence on the meaning of "necessary," the D.C. Circuit's holding that Section 951 does not "unambiguously compel release" of a certain type of information, and the confidentiality concerns associated with disseminating SSI data, plaintiffs have failed to establish a clear right to the SSI-eligibility data they request. *See Advocate Christ II*, 80 F.4th at 355.

"Because [plaintiffs] h[ave] failed to demonstrate 'a clear and indisputable right' to the relief [they] request[] and that the Government 'is violating a clear duty to act,' [the Court] need not consider the third threshold requirement of mandamus jurisdiction that no adequate alternative remedy exists." *Row 1*, 92 F.4th at 1149 (quoting *Am. Hosp. Ass'n*, 812 F.3d at 189).

As failure to meet any one of the three threshold requirements requires dismissal, plaintiffs have failed to state a claim entitling them to mandamus relief. *See id.*

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion to dismiss, ECF No. 19, is GRANTED. Specifically, plaintiffs' legal claims under the Medicare Act and the APA are dismissed for lack of subject matter jurisdiction and their mandamus claims are dismissed for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. Additionally, plaintiffs' Motion for Summary Judgment, ECF No. 22, and defendant's Cross-Motion for Summary Judgment, ECF No. 30, are each DENIED as moot.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  October 9, 2025

**BERYL A. HOWELL**
United States District Judge